MORRISON & FOERSTER LLP
Eric M. Acker (CA Bar No. 135805)
*eacker@mofo.com*
Krista S. deBoer (CA Bar No. 288842)
*kdeboer@mofo.com*
12531 High Bluff Drive, Suite 200
San Diego, CA 92130-3588
Telephone:   858.720.5109
Facsimile:   858.720.5125

AMERICAN IMMIGRATION COUNCIL
Michelle Lapointe* (DC Bar No. 90032063)
*mlapointe@immcouncil.org*
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Telephone:   202.507.7523
Facsimile:   202.742.5619

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy* (NY Bar No. 2860740)
*bazmy@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone:   212.614.6464
Facsimile:   212.614.6499

*Additional Attorneys for Plaintiffs Listed
On Next Page*

CENTER FOR GENDER AND
REFUGEE STUDIES
Melissa Crow*
(DC Bar No. 453487)
*crowmelissa@uclawsf.edu*
1121 14th Street, NW, Suite 200
Washington, DC 20005
Telephone:   202.355.4471
Facsimile:   415.581.8824

DEMOCRACY FORWARD
FOUNDATION
Brian Netter* (DC Bar No. 979362)
*bnetter@democracyforward.org*
P.O. Box 34553
Washington, DC 20043
Telephone:   202.448.9090
Facsimile:   202.796.4426

* *pro hac vice forthcoming*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, INC., a California
corporation, 511 E. San Ysidro Blvd.
#333, San Ysidro, CA 92173;

HAITIAN BRIDGE ALLIANCE, a
California corporation, 4560 Alvarado
Canyon Rd # 1H, San Diego, CA 92120;

MARIA DOE*
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

Case No.:   **'25 CV 1501 RBM BLM**

**CLASS ACTION COMPLAINT**

1

JESSICA DOE*
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

FERNANDO DOE*
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

ALI DOE*
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

EDUARDO DOE*
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

JEAN DOE*
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

ROUS DOE*
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

DIANA DOE*
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

NIKOLAI ZOLOTOV
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

ANAHI DOE*
c/o Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102;

1  DRAGON DOE*
   c/o Center for Gender and Refugee Studies
2  200 McAllister Street
   San Francisco, CA 94102,
3
                        Plaintiffs,
4
        v.
5
6  DONALD J. TRUMP, President of the
   United States, in his official capacity,
7  1600 Pennsylvania Avenue, NW,
   Washington, DC 20500;
8  KRISTI NOEM, Secretary of the U.S.
   Department of Homeland Security, in her
9  official capacity, 245 Murray Lane, SW,
   Washington, DC 20528;
10
11 MARCO RUBIO, U.S. Secretary of State,
   in his official capacity, Executive Office
12 of the Legal Adviser and Bureau of
   Legislative Affairs, Suite 5.600, 600 19th
   Street, NW, Washington DC 20522;
13
14 PAMELA BONDI, Attorney General of
   the United States, in her official capacity,
15 950 Pennsylvania Avenue, NW,
   Washington, DC 20530;
16 PETE R. FLORES, Acting Commissioner,
   U.S. Customs and Border Protection, in
17 his official capacity, 1300 Pennsylvania
   Avenue, NW, Washington, DC 20229;
18
19 DIANE J. SABATINO, Acting Executive
   Assistant Commissioner, Office of Field
20 Operations, U.S. Customs and Border
   Protection, in her official capacity, 1300
21 Pennsylvania Avenue, NW, Washington,
   DC 20229;
22                      Defendants.
23  _____
24 * A motion for these Individual Plaintiffs to proceed under pseudonym will be filed
   as soon as a Court has been assigned to this case.
25
26
27
28
                                    3

MORRISON & FOERSTER LLP
Robert W. Manoso*
(DC Bar No. 426323)
rmanoso@mofo.com
2100 L Street, NW, Suite 900
Washington, DC 20037
Telephone:      202.887.1555
Facsimile:      202.887.0763

AMERICAN IMMIGRATION COUNCIL
Rebecca Cassler* (DC Bar No. 90017398)
rcassler@immcouncil.org
Suchita Mathur* (DC Bar No. 90013156)
smathur@immcouncil.org
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Telephone:      202.507.7523
Facsimile:      202.742.5619

CENTER FOR CONSTITUTIONAL
RIGHTS
Angelo Guisado* (NY Bar No. 5182688)
aguisado@ccrjustice.org
Adina Marx-Arpadi*
(NY Bar No 6019335)
amarxarpadi@ccrjustice.org
666 Broadway, 7th Floor
New York, NY 10012
Telephone:      212.614.6464
Facsimile:      212.614.6499

CENTER FOR GENDER AND
REFUGEE STUDIES
Blaine Bookey (CA Bar No. 267596)
bookeybl@uclawsf.edu
Peter Habib (CA Bar No. 359646)
habibpeter@uclawsf.edu
200 McAllister Street
San Francisco, CA 94102
Telephone:      415.565.4877
Facsimile:      415.581.8824

CENTER FOR GENDER AND
REFUGEE STUDIES
Robert Pauw* (WA Bar No. 13613)
rpauw@ghp-law.net
c/o GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA 98104
Telephone:      206.682.1080
Facsimile:      206.689.2270

DEMOCRACY FORWARD
FOUNDATION
Sarah M. Rich* (GA Bar No. 281985)
srich@democracyforward.org
Adnan Perwez* (DC Bar No. 27532)
aperwez@democracyforward.org
P.O. Box 34553
Washington, DC 20043
Telephone:      202.448.9090
Facsimile:      202.796.4426

# I.    INTRODUCTION

1.    The 1980 Refugee Act enshrines the United States' commitment to provide protection to individuals fleeing persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Under the Act, Congress expressly provided that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival …), irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1).

2.    This case challenges actions by Defendants that override the plain text of 8 U.S.C. § 1158(a)(1) by unlawfully shutting down access to asylum at ports of entry along the U.S.-Mexico border ("POEs") as of January 20, 2025.[1]

3.    From May 2023 until January 20, 2025, the only available avenue for most noncitizens to seek asylum was to make an appointment through CBP One, a difficult-to-use government-administered mobile application. During this time, the Government repeatedly encouraged people seeking asylum to register for CBP One and to wait in Mexico until they received an appointment to present themselves at a POE.

4.    When an asylum seeker appeared at a POE for their scheduled CBP One appointment, DHS's usual practice was to issue them a notice to appear in immigration court and release them into the United States. The individual could then apply for asylum and related relief in immigration court proceedings.

5.    In reliance on the Government's representations and practices, Individual Plaintiffs Maria Doe, Jessica Doe, Fernando Doe, Ali Doe, Eduardo Doe, Jean Doe, Rous Doe, along with the subclass of asylum seekers they seek to represent, endured dangerous conditions in Mexico while trying repeatedly—often for months—to obtain CBP One appointments. Once they secured appointments,

---

[1] For purposes of this Complaint, a "port of entry" or "POE" refers to a "Class A" port of entry, which indicates that the POE may be used by all travelers. 8 C.F.R. § 100.4(a).

they did whatever was necessary to ensure that they reached the designated POE at the specified date and time, often navigating dangerous territory and spending substantial sums on travel. In the process, most missed the 30-day deadline to apply for asylum in Mexico and risked forfeiting that opportunity.

6.     But at noon ET on January 20, 2025, Defendants effectively terminated access to asylum. Defendants canceled all pending CBP One appointments and disabled the application's scheduling functionality. Later that day, President Trump issued an Executive Order directing the Secretary of Homeland Security to cease using CBP One altogether.

7.     The shutdown of CBP One came without prior notice, explanation, or any chance for the public to comment, and effectively closed the southern border to all those who wished to seek asylum and who had waited their turn for a CBP One appointment.

8.     Later on Inauguration Day, President Trump issued Proclamation No. 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025) ("Proclamation"). The Proclamation indefinitely suspends the "entry" of all noncitizens who "fail[], before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" 8 U.S.C. § 1182(a)(1)-(3). 90 Fed. Reg. 8335 at § 3.

9.     Department of Homeland Security guidance implementing the Proclamation states that noncitizens subject to the Proclamation are not permitted to cross the border for inspection at POEs.[2]

10.     The Proclamation also suspends both the "entry" and the "physical entry" of noncitizens deemed to be "engaged in the invasion," a concept the Proclamation does not define. 90 Fed. Reg. 8335-36 at §§ 1,4.

_____

[2] Ex. D to Mot. for Summary Judgment, *Refugee and Immigrant Ctr. For Ed. and Legal Servs v. Noem*, No. 1:25-cv-00306 (D.D.C. Mar. 24, 2025), ECF No. 44-4, https://www.courtlistener.com/docket/69606027/44/4/refugee-and-immigrant-center-for-education-and-legal-services-v-noem/. (Attached hereto as **Exhibit A.**)

11.    The Proclamation explicitly restricts noncitizens who fail to provide the aforementioned medical, criminal, and background information from invoking provisions of the Immigration and Nationality Act ("INA") that would permit their continued presence in the United States—including 8 U.S.C. § 1158.

12.    By taking these steps, Defendants established barriers that made it effectively impossible for Individual Plaintiffs or putative class members to access the U.S. asylum process at POEs.[3] First, Defendants pulled the rug out from under people who had made drastic and costly decisions in reliance on the processing requirements the Government had created. Then, Defendants imposed new, extra-statutory medical history and criminal background requirements that they knew virtually no asylum seeker could meet because individuals fleeing persecution rarely arrive at the border with such documents in hand. Moreover, Defendants established these requirements without even providing a mechanism for individuals to comply. Finally, Defendants prohibited individuals from presenting themselves at a POE to seek asylum, in violation of their statutory right. Upon information and belief, Defendants' actions have shut down all avenues for Individual Plaintiffs and putative class members to seek asylum in the United States.

13.    There is no legal basis for Defendants' decisions to cancel scheduled CBP One appointments ("CBP One Cancelation") or to effectively close southern border POEs to people seeking asylum ("Asylum Shutdown Policy"). To the contrary, Defendants have a statutory obligation to provide access to the U.S. asylum process. Nothing in the INA or any other source of law permits Defendants' actions.

14.    Through the Proclamation, the Asylum Shutdown Policy, and their implementation, as well as the CBP One Cancelation, Defendants have injured

---

[3] Through the Proclamation and its implementation, Defendants also prevented noncitizens physically present in the United States, including those who crossed the border between POEs, from accessing the asylum process. Those consequences of Defendants' actions are the subject of a separate challenge, *Refugee and Immigrant Ctr. For Ed. and Legal Servs v. Noem*, No. 1:25-cv-00306 (D.D.C. amended complaint filed February 19, 2025).

Individual Plaintiffs and putative class members. These unlawful actions have wreaked havoc on the lives of Individual Plaintiffs and those similarly situated by depriving them of access to the U.S. asylum process and leaving them stranded permanently in Mexico, where they face a persistent danger of kidnapping, murder, torture, rape, and other targeted violence.

15.    By closing all pathways for people to access the U.S. asylum process, Defendants' unlawful actions have also impaired Al Otro Lado's critical efforts to assist asylum seekers in Mexico in seeking protection in the United States and prevented Haitian Bridge Alliance from engaging in its core work of providing legal and humanitarian assistance to recently arrived Black migrants in the United States. The challenged actions, by causing immense panic and an acute humanitarian disaster for a vulnerable population, have interfered with both organizations' ability to provide effective services to their clients.

16.    Despite persistent efforts by Al Otro Lado and Haitian Bridge Alliance, among other organizations, and despite the Individual Plaintiffs' urgent need and right to seek asylum in the United States, Defendants show no signs of ending their unlawful actions or restoring access to the U.S. asylum process at POEs. Accordingly, Plaintiffs require the intervention of this Court to prevent Defendants from continuing to imperil the lives and safety of Individual Plaintiffs and putative class members, as well as Organizational Plaintiffs' core activities.

## II.    JURISDICTION AND VENUE

17.    This case arises under the INA, 8 U.S.C. § 1101 *et seq.*, and its implementing regulations; the Administrative Procedure Act ("APA," 5 U.S.C. §§ 551 *et seq.* and 701 *et seq.*); and the U.S. Constitution.

18.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346.

19.    This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

20.    The waiver of sovereign immunity in 5 U.S.C. § 702 applies to this action, in which Plaintiffs seek only non-monetary relief.

21.    Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendants are officers of the United States acting in their official capacity, Plaintiff Haitian Bridge Alliance's principal place of business is located in this district, Plaintiff Al Otro Lado maintains an office within this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

### III.    PARTIES

#### A.    Plaintiffs

22.    Plaintiff Maria Doe, a Mexican national, intends to seek protection in the United States by presenting herself at a POE. She used the CBP One app to obtain an appointment to present herself at the San Ysidro POE. On January 20, 2025, Defendants canceled Maria's appointment and shut down all access to asylum at POEs, leaving her with no method of seeking protection.

23.    Plaintiff Jessica Doe, a Colombian national, intends to seek protection in the United States by presenting herself at a POE. She used the CBP One app to obtain an appointment to present herself at the Brownsville POE. On January 20, 2025, Defendants canceled Jessica's appointment and shut down all access to asylum at POEs, leaving her with no method of seeking protection.

24.    Plaintiff Fernando Doe, a Venezuelan national, intends to seek protection in the United States by presenting himself at a POE. He used the CBP One app to obtain an appointment to present himself at the Nogales POE. On January 20, 2025, Defendants canceled Fernando's appointment and shut down all access to asylum at POEs, leaving him with no method of seeking protection.

25.    Plaintiff Ali Doe, an Afghan national, intends to seek protection in the United States by presenting himself at a POE. He used the CBP One app to obtain an appointment to present himself at the Nogales POE. On January 20, 2025, Defendants canceled Ali's appointment and shut down all access to asylum at POEs, leaving him

with no method of seeking protection.

26.     Plaintiff Eduardo Doe, a Venezuelan national, intends to seek protection in the United States by presenting himself at a POE. He used the CBP One app to obtain an appointment to present himself at the San Ysidro POE. On January 20, 2025, Defendants canceled Eduardo's appointment and shut down all access to asylum at POEs, leaving him with no method of seeking protection.

27.     Plaintiff Jean Doe, a Haitian national, intends to seek protection in the United States by presenting himself at a POE. He used the CBP One app to obtain an appointment to present himself at the Nogales POE. On January 20, 2025, Defendants canceled Jean's appointment and shut down all access to asylum at POEs, leaving him with no method of seeking protection.

28.     Plaintiff Rous Doe, a Venezuelan national, intends to seek protection in the United States by presenting herself at a POE. She used the CBP One app to obtain an appointment to present herself at the Nogales POE. On January 20, 2025, Defendants canceled Rous's appointment and shut down all access to asylum at POEs, leaving her with no method of seeking protection.

29.     Plaintiff Diana Doe, a Mexican national, intends to seek protection in the United States by presenting herself at a POE. On January 20, 2025, Defendants shut down all access to asylum at POEs, leaving her with no method of seeking protection.

30.     Plaintiff Nikolai Zolotov, a Russian national, intends to seek protection in the United States by presenting himself at a POE. On January 20, 2025, Defendants shut down all access to asylum at POEs, leaving him with no method of seeking protection.

31.     Plaintiff Anahi Doe, a Guatemalan national, intends to seek protection in the United States by presenting herself at a POE. On January 20, 2025, Defendants shut down all access to asylum at POEs, leaving her with no method of seeking protection.

32.    Plaintiff Dragon Doe, an Ecuadorian national, intends to seek protection in the United States by presenting himself at a POE. On January 20, 2025, Defendants shut down all access to asylum at POEs, leaving him with no method of seeking protection.

33.    Plaintiff Al Otro Lado, Inc. ("AOL") is a non-profit advocacy and legal services organization incorporated in California and headquartered in Los Angeles, with offices in San Diego, California, and Tijuana and Mexico City, Mexico. AOL provides holistic legal and humanitarian support to refugees, deportees, and immigrants on both sides of the U.S.-Mexico border. Its core work includes providing direct services and legal representation to people seeking asylum or navigating other immigration proceedings in the United States, providing know-your-rights information to migrants, human rights monitoring, seeking redress for civil rights violations, and advocating for immigration reform.

34.    AOL's Border Rights Project provides legal education, representation, accompaniment, and human rights monitoring for thousands of asylum seekers in Mexico who wish to seek asylum in the United States. The Border Rights Project team focuses on assisting particularly vulnerable asylum seekers to access the U.S. asylum process at POEs and providing them with information regarding immigration processes in the United States. This includes in-person accompaniment to POEs and filing humanitarian parole requests with CBP for particularly vulnerable individuals, including linguistically isolated individuals and those with disabilities or urgent medical needs, victims of gender-based violence, and groups that face disproportionate discrimination, such as Black and LGBTQ+ individuals. AOL also provides stop-gap humanitarian assistance to meet the basic needs of the populations it serves while they are temporarily waiting in Mexico to access the U.S. asylum process.

35.    Through the Proclamation, the Asylum Shutdown Policy, and their implementation, as well as the CBP One Cancelation, Defendants have thwarted

11

AOL's ability to carry out its core activities. AOL can no longer accompany or assist individuals in accessing the U.S. asylum system at POEs because Defendants have cut off all paths to seek asylum at U.S. POEs. Instead, AOL has been forced to shift its focus to attempt to meet the acute humanitarian needs associated with migrants' long-term presence in Mexico. AOL's clients now face indefinite—if not permanent—stays in unsanitary and precarious conditions, fall victim to violence perpetrated by criminal groups and Mexican officials, and even die while waiting for the now nonexistent chance to present at a U.S. POE to seek asylum. The resulting decrease in asylum seekers in the United States has also threatened AOL's existing funding streams and its contracts for domestic work.

36.    Plaintiff Haitian Bridge Alliance ("HBA") is a Black-led, women-led, Haitian Kreyòl-speaking grassroots and community-based nonprofit organization incorporated in California. HBA's main office is located in San Diego, California. HBA provides migrants and immigrants with humanitarian, legal, and social services, with a particular focus on Black immigrants, the Haitian community, women and girls, LGBTQIA+ individuals, as well as survivors of torture and other human rights abuses. HBA was founded for the purpose of assisting recently arrived Haitian and other Black immigrants in acclimating to and navigating their new lives in the United States, including pursuing lawful immigration status. Since 2016, this founding principle has informed how HBA has developed its core work, which includes providing U.S.-based legal assistance and humanitarian services to welcome recently arrived Black immigrants. HBA has also grown its presence on the U.S.-Mexico border in order to provide legal assistance and humanitarian services to Black migrants waiting in dire conditions in Mexico for the opportunity to seek asylum at U.S. POEs. HBA's border work is critical in light of the scarcity of linguistically and culturally appropriate resources for the Haitian community in northern Mexico.

37.    Through the Proclamation, the Asylum Shutdown Policy, and their implementation, as well as the CBP One Cancelation, Defendants have prevented

HBA from engaging in its core activity of welcoming recently arrived Black migrants with legal and humanitarian assistance in the United States. HBA has had to constrict various aspects of its U.S.-based services as the number of Black migrants arriving in the country has fallen precipitously. Additionally, the closure of POEs has interfered with HBA's ability to provide meaningful services at the border, as the acute humanitarian needs of their client population have vastly increased. HBA cannot effectively assist community members who have experienced extreme violence, medical emergencies, and even death, because they have been permanently stranded in Mexico.

**B.    Defendants**

38.    All Defendants are sued in their official capacities.

39.    Defendant Donald J. Trump is the President of the United States. In that capacity, he issued the Proclamation challenged in this lawsuit and oversees its implementation and enforcement.

40.    Defendant Kristi Noem is the Secretary of the U.S. Department of Homeland Security ("DHS"), a cabinet-level department of the federal government. Defendant Noem is responsible for the administration of U.S. immigration laws pursuant to 8 U.S.C. § 1103. She oversees each of the component agencies within DHS, including CBP, has ultimate authority over all DHS policies, procedures, and practices; and implements and enforces the Proclamation, the Asylum Shutdown Policy, the CBP One Cancelation, and any related DHS policies and guidance.

41.    Defendant Marco Rubio is the U.S. Secretary of State. In that capacity, he assists in implementing and enforcing the Proclamation, the Asylum Shutdown Policy, and any related agency policies and guidance.

42.    Defendant Pamela Bondi is the U.S. Attorney General, the principal officer in charge of the Department of Justice. In that capacity, Defendant Bondi is charged with assisting in implementing and enforcing the Proclamation, the Asylum Shutdown Policy, and any related agency policies and guidance.

13

43.    Defendant Pete R. Flores is the Acting Commissioner of CBP, the DHS component responsible for border security. Defendant Flores, who reports to Defendant Noem, is a supervisory official with direct authority over all CBP operations and responsibility for overseeing the implementation and enforcement of the Proclamation, the Asylum Shutdown Policy, the CBP One Cancelation, and any related CBP policies and guidance.

44.    Defendant Diane J. Sabatino is the Acting Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"). OFO is the largest component of CBP and is responsible for safeguarding border security at POEs. She exercises authority over 20 major field offices and 328 POEs. Defendant Sabatino, who reports to Defendant Flores, is a supervisory official responsible for implementing and enforcing the Proclamation, the Asylum Shutdown Policy, the CBP One Cancelation, and any related OFO policies and guidance at POEs.

## IV.    LEGAL BACKGROUND

### A.    Congress Enacted Significant Statutory Protections for Asylum Seekers Irrespective of Their Immigration Status.

45.    For the past 45 years, U.S. law has provided noncitizens at POEs an explicit right to seek asylum in the United States. Specifically, the INA provides that any noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen]'s status, may apply for asylum." 8 U.S.C. § 1158(a)(1).

46.    Because § 1158(a)(1) makes the right to apply for asylum available to noncitizens "at a designated port of arrival" and "irrespective of" their immigration status, the lack of a visa or other entry document cannot justify denying this right to any noncitizen coming to a POE.

47.    Additionally, by using the phrase "arrives in" in 8 U.S.C. § 1158(a)(1), Congress afforded this right to noncitizens who are not yet physically present in the United States but are in the process of arriving in the United States at a POE.

48.    Asylum seekers need not be "admissible" under the INA to avail themselves of the right to seek asylum.

49.    The INA defines "admission" as "the lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

50.    The INA "sets the boundaries of admissibility to the United States." *Trump v. Hawaii*, 585 U.S. 667, 695 (2018). Section 1182(a) sets forth classes of noncitizens who are "inadmissible" to the country, including people with certain "health related" conditions and people with specific criminal convictions. Those who are inadmissible under one or more provisions of § 1182(a) are "ineligible to receive visas and ineligible to be admitted to the United States" unless the INA allows for a waiver of the applicable ground of inadmissibility. 8 U.S.C. § 1182(a). Visa applicants must provide the government sufficient information, including medical and criminal history, to establish that they are not inadmissible to the United States in order to be granted a visa that authorizes their admission into the United States at a port of entry.

51.    By contrast, asylum seekers do not need to provide such information in order to present themselves at a POE. Even people who are inadmissible to the United States under 8 U.S.C. § 1182(a) are allowed to apply for asylum under 8 U.S.C. § 1158(a)(1).

52.    The INA further requires that every noncitizen "who arrives in the United States"—including those who arrive "at a designated port of arrival"—"shall be deemed . . . an applicant for admission" and "shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(1), (3). When a noncitizen at a POE lacks an entry document, as is the case for most people seeking asylum at the border, CBP may place such individuals in either expedited removal proceedings under 8 U.S.C. § 1225(b)(1) or regular removal proceedings under 8 U.S.C. § 1229(a), or may parole them into the United States under 8 U.S.C. § 1182(d)(5)(A), enabling them to file an

1    affirmative asylum application.

2         53.    If a noncitizen in expedited removal proceedings expresses an intention

3    to apply for asylum or a fear of persecution, CBP has a mandatory duty to refer the

4    noncitizen for a screening interview by an asylum officer. 8 U.S.C.

5    § 1225(b)(1)(A)(ii). If the asylum officer, or the immigration judge upon review of

6    the asylum officer's decision, determines that the noncitizen has a credible fear of

7    persecution, the noncitizen will be placed in regular removal proceedings before an

8    immigration judge. *See* 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. §§ 208.30(f),

9    1208.33(b)(v)(A).

10        54.    A noncitizen in regular removal proceedings may submit an asylum

11   application. 8 U.S.C. § 1158(d)(1); *see generally* 8 C.F.R. Part 208 Subpart A,

12   Part 1208 Subpart A.

13        55.    In sum, 8 U.S.C. § 1158(a)(1) requires access to POEs for people

14   seeking asylum and mandates that all such individuals be given access to a process

15   to seek asylum.

16   **B.    The President's Limited Authority to Suspend Entry May Not Be
17   Exercised in a Manner that Violates Other INA Provisions,
     Including the Statutory Right to Seek Asylum.**

18        56.    Congress delegated to the President the power to suspend "entry" of

19   noncitizens into the United States under specific circumstances in § 212(e) of the

20   1952 INA (8 U.S.C. § 1182(e)). *See* Pub. L. No. 82-414, 66 Stat. 163, 188 (1952).

21   The key language of that provision is identical to the current version, codified in INA

22   § 212(f) (8 U.S.C. § 1182(f)), which provides in relevant part:

23        Whenever the President finds that the entry of any [noncitizens] or of
24        any class of [noncitizens] into the United States would be detrimental to
          the interests of the United States, he may by proclamation, and for such
25        period as he shall deem necessary, suspend the entry of all [noncitizens]
          or any class of [noncitizens] as immigrants or nonimmigrants, or impose
26        on the entry of [noncitizens] any restrictions he may deem to be
          appropriate.

27        57.    In 1980, Congress enacted the Refugee Act, Pub. L. No. 96-212, 94

28   Stat. 102 (1980), to protect individuals fleeing persecution in their home countries.

The Refugee Act, which became part of the INA, created the right to apply for asylum found in § 1158(a)(1). Congress could have included as conditions for asylum the medical and criminal background information requirements that applied to visa eligibility under § 1182(a)—but it did not impose such requirements for asylum applicants.

58.    Section 212(f) does not authorize the President to violate or abrogate other provisions of the INA, such as § 1158. No president invoked § 212(f) for nearly 30 years, until 1981.[4] Since then, the Executive Branch's longstanding legal position has been that § 212(f) does not permit the President to alter the rights and procedures regarding asylum found elsewhere in the INA. *See* 89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024).

59.    Instead, presidents have typically used § 212(f) to suspend the entry of noncitizens who have an affiliation with a group that the government opposes or who are engaged in objectionable conduct.

60.    Courts have also assumed—consistent with the Executive Branch's longstanding position—that § 212(f) does not give the President authority to override other provisions of the INA. *See, e.g.*, *Hawaii*, 585 U.S. at 689.

61.    Additionally, the suspension of entry that is contemplated by § 212(f) does not permit Defendants to suspend access to the asylum process because individuals who seek asylum at a POE do not legally "enter" the country.

62.    The terms "entry" and "admission" are used interchangeably in the INA. *Hawaii*, 585 U.S. at 695 n.4 (citing 8 U.S.C. § 1101(a)(13)(A)). Thus, a noncitizen has not "entered" the United States if their inspection by an immigration officer results in physical entry but not admission. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953) (noncitizens who are physically present and paroled into the country pending adjudication of rights are "treated as if stopped at the

_____

[4] *See* Kelsy Y. Santamaria, et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)*, at 3, 22 (2024).

border," and do not make an "entry"). Asylum seekers processed at POEs have neither effectuated an entry nor been admitted. Similarly, a grant of asylum is also not an "admission," *i.e.*, an "entry." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 757 (9th Cir. 2018).

63.    The President's authority to "suspend entry" under § 212(f) thus does not encompass the power to suspend the operation of § 1158, which gives noncitizens the right to apply for asylum, including at POEs. Congress has made extensive changes to the INA since § 1158's enactment but has never revised § 212(f) to permit otherwise.

64.    The other provision on which the Proclamation relies, INA Section 215(a)(1), likewise does not authorize the President to abrogate the right to apply for asylum. Section 215(a)(1) provides that, "[u]nless otherwise ordered by the President, it shall be unlawful . . . for any [noncitizen] to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

65.    As with § 212(f), § 215(a)(1) does not authorize the President to abrogate rights or duties that Congress provided elsewhere in the INA. This provision typically has been invoked in conjunction with § 212(f). And consistent with the Executive Branch's recognition that "this provision 'substantially overlap[s]' with" § 212(f), *Hawaii*, 585 U.S. at 683 n.1 (quoting Brief submitted by the Government 32-33), the Executive Branch has never before claimed—and indeed has expressly disavowed—that it empowers the President to "impose [a] condition and limitation on asylum eligibility." 89 Fed. Reg. at 81164 n.56.

66.    The Proclamation also cites Article II and Article IV, Section 4 of the Constitution as authority to suspend the "physical entry" of noncitizens "engaged in the invasion." 90 Fed. Reg. 8335 at § 4. Article II requires the President to "take Care that the Laws be faithfully executed" and does not authorize him to suspend any acts

of Congress. U.S. Const. art. II, § 3. Article IV, Section 4 requires the United States—not the President—to "protect each [State in this Union] from invasion." *Id.* art. IV, § 4. Asylum seekers coming to ports of entry on the border are not engaged in an "invasion" within the meaning of Article IV, Section 4 or any other part of the Constitution, and thus the President lacks authority to prevent their "physical entry" into POEs.

## V.    FACTUAL BACKGROUND

67.    Beginning in 2016, the Executive Branch concocted one policy experiment after another to curtail access to asylum for people coming to the United States at POEs along the southern border. When courts have reviewed the merits of these policies, they have generally concluded that ending access to asylum at the border, in whole or even in part, is beyond Defendants' authority. So too are Defendants' new policies blocking access to asylum at POEs.

### A.    Restrictions on Access to Asylum, Late 2016 – May 2023.

68.    From late 2016 through March 2020, the Government coordinated with Mexican officials to implement a "metering," or waitlist, system to restrict migrants' access to POEs along the southern border. When people seeking asylum approached a POE, CBP officers falsely claimed that CBP "lacked capacity" to inspect and process them and turned them back to Mexico. These turnbacks were held to be "unlawful regardless of the purported justification." *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1049-50 (S.D. Cal. 2022); *Al Otro Lado v. EOIR*, Nos. 22-5988, 22-56036, 2024 WL 5692756 at *10 (9th Cir. May 14, 2025) ("[A] noncitizen stopped by U.S. officials at the border is eligible to apply for asylum under § 1158."). CBP thereafter rescinded the policy and issued new guidance prohibiting officers from engaging in metering.

69.    With the onset of the pandemic in March 2020, the Government continued turning back asylum seekers at POEs—and expelling those who managed to cross the border—pursuant to a "Title 42" policy based on an order issued by the

Centers for Disease Control, purportedly to prevent the spread of COVID-19. A federal district court held that order to be both unlawful and unrelated to any public health grounds, after which the policy was rescinded. *See Huisha-Huisha v. Mayorkas*, 642 F. Supp. 3d 1 (D.D.C. 2022), *vacated as moot*, No. 22-5325, 2023 WL 5921335 (D.C. Cir. Sept. 7, 2023).

**B.    May 2023 – January 20, 2025: For Virtually All Individuals Arriving at a POE, CBP One Is the Only Way to Access Asylum.**

70.    When the Title 42 policy ended in May 2023, the Government began requiring noncitizens seeking asylum at POEs to schedule an appointment in advance using a smartphone application called "CBP One."

71.    CBP did so pursuant to two rules, the May 2023 Circumvention of Lawful Pathways Rule ("CLP Rule")[5] and the June 2024 Securing the Border Rule ("STB Rule").[6] While there are some differences between the two Rules, their effect was to channel nearly all asylum seekers coming to POEs through CBP One and to make those without a CBP One appointment ineligible for asylum.

72.    The CLP and STB Rules contain certain narrow exceptions for some

---

[5] Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023); 8 C.F.R. § 208.33(a)(1), (2)(ii)(B). Challenges to the validity of the CLP Rule remain pending. *E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023) (vacating the CLP Rule because, *inter alia*, it is contrary to § 1158(a)(1)), *stayed pending appeal*, No. 23-16032, 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *vacated and remanded for further proceedings*, 134 F.4th 545 (9th Cir. 2025); *M.A. v. Mayorkas*, No. 1:23-cv-01843, 2023 WL 5321924 (D.D.C. Jul. 6, 2023). The CLP Rule expired on May 11, 2025, and has not been extended to apply to new entrants. *E. Bay Sanctuary Covenant v. Trump*, No. 4:18-cv-06810 (N.D. Cal. May 20, 2025), ECF 210 at 1.

[6] Securing the Border, 89 Fed. Reg 48,710 (published June 7, 2024) (interim final rule); Securing the Border, 89 Fed. Reg. 81,156 (Oct. 7, 2024) (final rule). The suspension and limitation on entry in the STB Rule were in effect when the average number of daily encounters of migrants at the southern border surpassed a certain threshold. 89 Fed. Reg. 80,351-53. That threshold was exceeded continuously since July 2020. *See* "The Futility of 'Shutting Down Asylum' by Executive Action at the U.S.-Mexico Border," WOLA (June 4, 2024), https://www.wola.org/analysis/futility-of-shutting-down-asylum-by-executive-action-us-mexico-border/. On May 9, 2025, the U.S. District Court for the District of Columbia vacated the STB Rule in large part. *Las Americas Immigrant Advocacy Center v. U.S. DHS*, No. 1:24-cv-01702 (D.D.C. May 9, 2025), ECF No. 92.

particularly vulnerable noncitizens without CBP One appointments. 88 Fed. Reg. 31,318; 89 Fed. Reg. 48,491-92. But in practice, most migrants have been unable to invoke the exceptions, leaving them ineligible for asylum without a CBP One appointment.

73.    Although both Rules purport to preserve access for people seeking asylum who present at a POE without a CBP One appointment, CBP's inspection and processing of asylum seekers at POEs without appointments nearly came to a border-wide halt during the time the Rules were in force.

74.    In violation of the INA, CBP blocked access to POEs for individuals without CBP One appointments, turning them back before they could cross the international border into a POE.

75.    The CLP and STB Rules effectively created a digital metering system that restricted access to the U.S. asylum process to a limited number of migrants who had access to a smartphone and were technologically savvy enough to navigate the app, literate in one of the languages supported by the app, and able to wait indefinitely in Mexico until an appointment became available and could be scheduled.

76.    To register on the app, noncitizens had to submit extensive biographic and biometric information, after which they could request an appointment within a 23-hour period (e.g., 11 a.m. to 10 a.m. the following day). If they received an appointment, they would be notified the next day. The app used "geofencing" technology to limit its use to individuals physically located within specific geographic areas of Mexico. Because the Government restricted use of the app in this way, anyone hoping to access the asylum process in the United States via a southern border POE had to be physically present in Mexico to request an appointment.

77.    Beginning in July 2023, CBP made 1,450 CBP One appointments available per day, divided among eight major POEs across the southern border. CBP's practice was to schedule appointments approximately three weeks in advance.

78.    The number of CBP One appointments available was inadequate

relative to the number of noncitizens in dire need of protection. As of November 2024, some Mexicans reported waiting up to 11 months for a CBP One appointment, and some non-Mexicans reported waiting up to seven months.[7]

79.    By January 2025, the practical effect of the CLP and STB Rules was that only those migrants lucky enough to obtain one of the scarce CBP One appointments could reach a POE, be inspected, and access the asylum process. Moreover, asylum was generally unavailable to people who entered between POEs.

80.    Until January 20, 2025, the Government lauded CBP One and encouraged noncitizens to make appointments using the system. *See, e.g.*, 89 Fed. Reg. at 81156, 81184, 81192, 81213, 81215 (calling CBP One "significant," "important," "key," "critical," and "especially critical during emergency border situations"). In doing so, the Government repeatedly made clear that noncitizens who made CBP One appointments would be able to seek asylum and other humanitarian relief in the United States. *See, e.g.*, 88 Fed. Reg. at 31350, 31400-01; *Las Americas Immigrant Advocacy Ctr. v. United States DHS*, No. 1:24-cv-1702 (Dec. 4, 2024) Dkt. 62, at 6-9; *id.* (Dec. 18, 2024) Dkt. 67, at 3.

81.    Migrants seeking CBP One appointments could not count on obtaining an appointment at any specific time. To the contrary, most attempts failed given the limited number of appointment slots. People routinely would try to sign up every day for months before securing a CBP One appointment, and thousands of people never obtained one despite repeated attempts. Lack of internet access and electricity, lack of understanding of the few languages available on the CBP One app, and other technology-related issues prevented countless others from successfully navigating the app.

82.    Despite the obstacles to accessing the CBP One app and the egregious

---

[7] Strauss Center for International Security and Law, *Asylum Processing at the Border Waitlists: November 2024* (Nov. 2024), at 4, https://www.strausscenter.org/publications/asylum-processing-at-the-u-s-mexico-border-november-2024/.

living conditions they were forced to endure, thousands of people seeking asylum went to great lengths to follow the Government's instructions, avoid crossing the border unlawfully, and preserve their access to asylum in the United States by using the app to try to schedule appointments at POEs.

83. Critically, for most individuals, reliance on the CBP One process foreclosed the possibility of seeking asylum in Mexico because of Mexico's filing deadline and how the Mexican asylum system's physical location requirement interacted with the app.

84. To apply for asylum in Mexico, a migrant must submit an application within 30 days of arriving in the country. Many migrants were advised by local government or other authorities not to apply for asylum in Mexico if they intended to seek protection in the United States, and their 30-day windows thus expired while they were waiting for CBP One appointments. Moreover, the *Comisión Mexicana de Ayuda a Refugiados* (COMAR), Mexico's asylum agency, recently indicated that missing the deadline due to use of the CBP One app will not excuse non-compliance with the 30-day deadline, thereby barring asylum for many migrants.

85. Additionally, an individual seeking asylum in Mexico must remain in the Mexican state where they first applied for asylum throughout the pendency of their claim. Departure from the state will lead COMAR to deem the application abandoned. Many migrants were also required to apply in Mexico's southern states, where they first encountered Mexican authorities. Because use of CBP One was initially restricted to people in northern Mexico, many people were forced to abandon asylum claims they had filed in other parts of the country in order to travel northward to the geographic area where CBP One was accessible.

86. Overcoming the 30-day bar and reinstating an abandoned claim are very difficult, especially for those without an attorney, and the vast majority of people seeking asylum in Mexico do not have access to legal representation.

87. As of January 20, 2025, many migrants seeking access to POEs to apply

23

for asylum had forfeited their chance to seek asylum in Mexico, instead relying on the use of CBP One to reach safety in the United States.

88.    On the morning of January 20, 2025, approximately 30,000 asylum seekers who had CBP One appointments scheduled within the next month were waiting in Mexico. Some had booked flights to the border and to their eventual destinations in the United States, only to arrive at the border to learn that their appointments had been canceled.

89.    At that time, many more migrants in Mexico had registered on CBP One and had been using the app in the hope of obtaining an appointment. The vast majority had not yet secured one of the limited appointments. Countless others had not yet successfully registered on the CBP One app.

**C.    Access to the U.S. Asylum Process at Ports of Entry Ended on January 20, 2025.**

**1.    Immediately After President Trump's Inauguration, CBP Canceled All Scheduled CBP One Appointments and Disabled CBP One.**

90.    Beginning at noon Eastern Time on January 20, 2025, CBP—without prior notice or explanation—began turning away asylum seekers with CBP One appointments, telling them that their appointments had been canceled.

91.    Just moments later, CBP posted an announcement on its website stating: "Effective January 20, 2025, the functionalities of CBP One™ that previously allowed undocumented [noncitizens] to submit advance information and schedule appointments at eight southwest border ports of entry is [sic] no longer available, and existing appointments have been cancelled."[8]

92.    The same day, President Trump issued the "Securing Our Borders" executive order that directed the Secretary of DHS to cease using the CBP One mobile application "as a method of paroling or facilitating the entry of otherwise

---

[8] Ximena Bustillo & Jasmine Garsd, *Trump reinforces use of his 'Remain in Mexico' policy*, NPR (Jan. 20, 2025, at 13:46 ET), https://www.npr.org/2025/01/20/g-s1-43802/trump-immigration-border-remain-in-mexico-policy.

inadmissible [noncitizens] into the United States." 90 Fed. Reg. 8,467, 8,468 (Jan. 20, 2025). That same evening, President Trump issued the Proclamation. 90 Fed. Reg. 8333 (Jan. 20, 2025).

93.    Since January 20, 2025, CBP, in coordination with Mexican authorities, has been turning away people trying to present at POEs, including those who have presented at the date and time designated in their CBP One appointments, and refusing to inspect and process them.

94.    On January 21, 2025, CBP issued a press release announcing the "removal of the scheduling functionality of the CBP One™ mobile application, effective Jan. 20, 2025, at noon EST" and the cancelation of all existing appointments, totaling approximately 30,000.[9] The press release offered no justification or explanation for these actions. Nor did it mention the significant reliance interests on the continued availability of CBP One appointments that the Government's prior actions had generated.

95.    Defendants' decision to cancel scheduled CBP One appointments and remove the app's scheduling functionality eliminated the only method available to virtually all individuals seeking asylum at the U.S.-Mexico border between May 2023 and the morning of January 20, 2025.

### 2.    Defendants Close Ports of Entry to Asylum Seekers.

96.    The Proclamation, issued by President Trump on January 20, 2025, asserts that "[o]ver the last 4 years," people without entry documents coming into the United States were not being effectively screened for inadmissibility under 8 U.S.C. §§ 1182(a)(1)-(3) because such screening "can be wholly ineffective in the border environment"; that such screening is legally "required"; and that the lack of such screening thus "[led] to the unauthorized entry of innumerable illegal [noncitizens]

---

[9] *CBP Removes Scheduling Functionality in CBP One™ App*, U.S. Customs & Border Protection (last modified Jan. 22, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app.

into the United States." 90 Fed. Reg. at 8333. The Proclamation's preamble also vaguely asserts that based on the "current state of the southern border," there is an "ongoing" "invasion" there. 90 Fed. Reg. at 8334.

97.    Invoking §§ 212(f) and 215(a)(1), the Proclamation "suspends the entry" indefinitely of noncitizens "engaged in the invasion" or who "fail[], before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" § 1182(a)(1)-(3), on or after January 20, 2025. 90 Fed. Reg. 8335 at § 4.

98.    Relying on the same statutory provisions, the Proclamation also indefinitely "restrict[s noncitizens'] access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to," § 1158 (right to apply for asylum). 90 Fed. Reg. 8335 at § 3.

99.    In addition to suspending "entry" pursuant to §§ 212(f) and 215(a)(1), the Proclamation also suspends the "physical entry of any [noncitizen] engaged in the invasion across the southern border." President Trump asserts the authority to do so flows from Article II and Article IV, section 4 of the Constitution. 90 Fed. Reg. 8335 at § 4.

100.    The Proclamation further orders Secretary Noem, Secretary Rubio, and Attorney General Bondi to "take all appropriate action" to "repel, repatriate, or remove any [noncitizen] engaged in the invasion across the southern border of the United States on or after the date of this order" and to otherwise take "appropriate actions as may be necessary to achieve the objectives of" the Proclamation. 90 Fed. Reg. 8335-36 at §§ 4-5.

101.    Finally, the Proclamation indicates that it does not impair "the authority granted by law to an executive department or agency" and provides that it "shall be implemented consistent with applicable law." 90 Fed. Reg. 8336 at § 5-6.

102.    On information and belief, Defendants began implementing the Asylum

Shutdown Policy, under which they block asylum seekers from accessing POEs along the southern border, immediately after the inauguration. In early February 2025, CBP issued written guidance to its Office of Field Operations in the form of a memorandum and an attached muster memorializing the Asylum Shutdown Policy.[10] The muster states that it is implementing Section 3 of the Proclamation. Defendants updated the OFO guidance on February 28, 2025.

103.   CBP's written guidance implements Section 3 of the Proclamation and memorializes the Asylum Shutdown Policy by:

a. Stating that Section 3 of the Proclamation "suspends entry to the U.S. at all [POEs] for [noncitizens] who fail to provide sufficient medical information and reliable criminal history and background information to enable fulfillment of the requirements of sections 1182(a)(l)-(3) of the [INA]";

b. Exempting from the Proclamation U.S. citizens, lawful permanent residents, people with "valid entry documents" (such as a visa), and unaccompanied children; and

c. Stating that noncitizens "subject to the Proclamation shall not be permitted to cross the international boundary," even if the person "claims or manifests a fear at the international boundary line."

104.   The guidance also implements the Securing Our Borders executive order and notes that, at the time the muster was issued, the STB Rule was still in effect.

105.   DHS has confirmed that pursuant to CBP's guidance implementing Section 3 of the Proclamation, noncitizens at land border POEs "who lack valid entry documents or otherwise fail to provide sufficient medical information or reliable criminal history and background information are prevented from entering the United States at the physical border." *Refugee and Immigrant Ctr. For Ed. and Legal Servs.*

---

[10] Exhibit A, *supra* note 2.

*v. Noem*, No. 1:25-cv-00306 (D.D.C. Mar. 24, 2025), ECF 44-5, Declaration of Ihsan Gunduz, Acting Deputy Assistant Secretary for Border and Immigration Policy, DHS, ¶ 35.

106.  Upon information and belief, Defendants have not provided any mechanism for asylum seekers to provide medical history and criminal background information to CBP prior to presenting at POEs.

### 3.  Defendants' Unlawful Actions Place People Seeking Asylum in Grave Danger.

107.  Pursuant to the Proclamation, the Asylum Shutdown Policy, and their implementation, as well as the CBP One Cancelation, CBP officers are blocking asylum seekers' access to POEs, leaving them stranded under perilous conditions in Mexico. To this day, the State Department warns that "[v]iolent crime—such as homicide, kidnapping, carjacking, and robbery—is widespread and common in Mexico."[11] The State Department has also recognized that armed groups frequently limit the movements of migrants within Mexico and that human smuggling organizations hold significant power throughout the country.[12]

108.  Migrants in Mexico also face local military, law enforcement, and immigration officials who are hostile to their presence in the country and target them for extortion, violence, and arbitrary detention.

109.  Multiple reports have highlighted the troubling collaboration between Mexican officials and criminal organizations in perpetrating crimes against migrants in Mexico.[13] Such collusion is particularly prevalent in the border towns of

---

[11] U.S. Dep't of State, Bureau of Consular Affairs, Mexico Travel Advisory (Sept. 6, 2024), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

[12] U.S. State Department, Mexico 2023 Human Rights Report (April 22, 2024) https://www.state.gov/wp-content/uploads/2024/02/528267_MEXICO-2023-HUMAN-RIGHTS-REPORT.pdf.

[13] *See, e.g.*, The Hope Border Institute, *"I am physically and mentally exhausted": Migration policies and health at the US-Mexico border* (February 2025)

Matamoros, Nuevo Laredo, and Reynosa, located in Tamaulipas state, where over 40 percent of CBP One appointments were issued as of February 2024. The groups controlling criminality in Tamaulipas make millions of dollars annually from cross-border drug trafficking, human trafficking, and migrant smuggling.

110.    The U.S. government has outsourced a substantial portion of immigration enforcement to the Mexican government and encouraged the militarization of Mexico's response to migration flows. The Mexican government has deployed thousands of National Guard soldiers alongside agents from the *Instituto Nacional de Migración* ("INM"), the Mexican immigration agency, to monitor, interdict, and turn back noncitizens seeking to reach the U.S.-Mexico border. Human Rights First has tracked reports of over 2,500 asylum seekers and other migrants who survived kidnapping, murder, torture, rape, assault, and other serious harms while they were stranded in Mexico in the year following the May 2023 CLP Rule.[14]

111.    Other civil society organizations have also documented widespread violence against migrants in cities along the U.S.-Mexico border and in southern Mexico, where many people seeking asylum were stranded until they obtained CBP One appointments and were permitted to travel within Mexico.[15]

---

https://www.hopeborder.org/_files/ugd/e07ba9_ace6c56b089a413c8b50b459c3f99826.pdf.

[14] *See, e.g.*, Human Rights First, *Trapped, Preyed Upon, and Punished: One Year of the Biden Administration Asylum Ban* (May 2024), https://humanrightsfirst.org/wp-content/uploads/2024/05/Asylum-Ban-One-Year-Report_final-formatted_5.13.24.pdf.

[15] *See, e.g.*, Human Rights Watch, *"We Couldn't Wait": Digital Metering at the U.S.-Mexico Border* (May 2024) ("The more difficult it is for migrants to cross the U.S.-Mexico border, the more money cartels make, whether from smuggling operations or from kidnapping and extortion."); Doctors Without Borders, *17 Days in Captivity Along the U.S.-Mexico Border* (February 28, 2024) (increasing reports of sexual violence in northern Mexico); The Hope Border Institute, *"I am physically and mentally exhausted": Migration policies and health at the US-Mexico border*, (February                                                                                  2025) https://www.hopeborder.org/_files/ugd/e07ba9_ace6c56b089a413c8b50b459c3f99826.pdf (recent survey of 177 migrants in Ciudad Juárez conducted by Hope Border Institute showed that four out of five respondents had been victims of some form of

112.   Black, Indigenous, LGBTQI+, and non-Spanish speaking migrants face a particularly high risk of discrimination and targeted violence from local police and cartels while waiting in Mexico.[16]

113.   In addition to threats to their physical safety, migrants in Mexico often have difficulty securing access to stable housing, employment, food, drinking water, medical care, and other basic needs.

### 4.   Defendants' Unlawful Actions Have Caused Severe Harm to Each of the Plaintiffs.

114.   **Harm to Maria Doe.** In 2019, Mexican police associated with the *Cártel de Jalisco Nueva Generación* physically assaulted Maria, her first husband, and their younger son in their home and then murdered her husband. Due to Maria's participation in the criminal case against the assailants, the cartel began its years-long retaliation against her and her family, resulting in the murder of a family friend and the disappearance of Maria's son, his wife, and their two-year-old daughter. Due to repeated threats from the cartel, Maria has relocated repeatedly in Mexico. However, cartel members have found her and kidnapped her multiple times to try to convince her to recant her testimony, which has placed several high-ranking Mexican government officials in jail. In February 2024, the cartel again kidnapped Maria along with her second husband, whom they badly beat. Maria and her husband fled to Tijuana.

---

cartel violence, including a particular prevalence of kidnappings in which Mexican officials were sometimes complicit); KBI and WOLA, *From the Field: The First 14 Days of Border Impacts Under the Trump Administration's Executive Orders* (Jan. 2025), https://www.kinoborderinitiative.org/abuse-documentation/ https://www.kinoborderinitiative.org/wp-content/uploads/2025/02/One-Pager-2-weeks-after-Trumps-come-back-1.pdf (comparable dangers of violence and extortion against migrants in Nogales by criminal organizations and human rights abuses by Mexican authorities); "Continúa cobro de piso en albergues de migrantes en Tijuana," *XEWT Canal 12*, August 12, 2024, https://xewt12.com/%20noticias/continua-cobro-de-piso-en-albergues-de-migrantes-en-tijuana/ (as of August 2024, at least 10 of Tijuana's 30 shelters had reported experiencing threats from criminal groups or demands for extortion fees).

[16] Human Rights First, *Trapped, Preyed Upon, And Punished: One Year of the Biden Administration Asylum Ban* (May 2024), at 12-14.

115.   Since reaching Tijuana in August 2024, Maria and her husband have lived in hiding in a shelter, where someone helped them register for CBP One. They received an appointment to present at the San Ysidro port of entry on February 9, 2025. Their appointment was canceled on January 20, 2025.

116.   Since then, Maria has remained in hiding with her husband, her physical and mental health have deteriorated, and they live in constant fear. They recently heard that the cartel has offered a reward of seven million Mexican pesos for information about their whereabouts. They have changed their phone numbers and do not make contact with any family or friends.

117.   **Harm to Jessica Doe.** Jessica and her three children fled Colombia in June 2024 because of intensifying death threats from a powerful gang and drug trafficking organization known as *Los Paisas*. When she was 16, Jessica's family moved her to live with her mother in Bogotá, where *Los Paisas* forced her to work for them. They regularly raped her, beat her, threatened her and her family, and sold her as a sex slave. When she tried to flee, they hurt or killed someone she loved, including murdering her mother. They subsequently murdered Jessica's close friend before her eyes and then brutally beat Jessica until they thought she was dead. Jessica moved to other places in Colombia, but *Los Paisas* always found her. In June 2024, after *Los Paisas* threatened to kill her son, Jessica and her three children fled to Mexico City with the intention of seeking asylum in the United States.

118.   After she got to Mexico City, Jessica registered immediately for CBP One and tried every day to secure an appointment. The sole exception was during the five days in September 2024 when she was kidnapped and detained by gang members who intended to sell her into sexual slavery. After escaping from her kidnappers, Jessica and her children moved to Matamoros. She resumed her daily attempts to secure a CBP One appointment until January 17, 2025, when she finally received an appointment scheduled for February 9, 2025.

119.   On January 20, 2025, when Jessica learned that her appointment had

been canceled, she fell into a deep depression and contemplated suicide. On January 25, 2025, she tried to approach the Matamoros port of entry, but Mexican officials blocked her before she could get to the bridge and told her that "there was no CBP One anymore." Jessica, who has multiple sclerosis, and her children, one of whom is epileptic, remain in Matamoros, where they struggle to survive and she lives in constant fear that she will be kidnapped or trafficked and that her children will be harmed. Jessica has not applied for asylum in Mexico because she does not feel safe there and, in any case, missed the 30-day deadline to do so. If she and her children were forced to return to Colombia, Jessica is certain that *Los Paisas* would kill or disappear them.

120.    **Harm to Fernando Doe.** Fernando Doe fled Venezuela in March 2024 after the Venezuelan government initiated a repressive crackdown against him and fellow leaders of the *Voluntad Popular* party who oppose the ruling Maduro regime. After he and other party activists organized large anti-government street protests, many of his associates were detained without charge. Fearing that they would meet the same fate, Fernando and his brother, who was also a party member, fled the country. During their arduous journey north through Colombia, the Darién Gap, and Central America, they were repeatedly attacked and extorted.

121.    After reaching Chiapas, Mexico, Fernando and his brother traveled north primarily on foot and by bicycle to get to Mexico City, where they could register for CBP One. During their journey, they were extorted several times and kidnapped and detained for two days by the *Zetas* cartel. Fernando was beaten so severely that he required emergency surgery a short time later to repair life-threatening damage to his internal organs. After reaching Mexico City in May 2024, Fernando attempted to secure a CBP One appointment every day for seven months. Finally, on January 6, 2025, he secured an appointment for January 25, 2025, at the Nogales POE. Fernando spent the last of his money on travel costs to get to Nogales in time for his appointment. While en route to Nogales, he received

notification that his CBP One appointment had been canceled.

122.   Since then, Fernando has been stranded in Nogales, where he has been threatened by masked men whom he believes are linked to certain narco-trafficking syndicates tied to the Maduro regime in Venezuela. Due to these risks, he cannot continue his advocacy efforts in Mexico. He is extremely depressed and struggling to survive. Fernando missed the 30-day deadline to apply for asylum in Mexico and remains stranded and afraid for his safety. If forced to return to Venezuela, he fears he will be imprisoned indefinitely or disappeared by the Maduro regime.

123.   **Harm to Ali Doe.** Ali Doe fled Afghanistan due to the imminent Taliban takeover in 2021. He feared for his life under the Taliban because of his work with the previous government and his Hazara ethnicity. After spending three years in Iran, he was unable to obtain status there and was deported back to Afghanistan, where he lived in hiding for about a month before fleeing the country again in July 2024. Ali reached Tapachula, Mexico around October 2024 and left soon afterward for Mexico City.

124.   Soon after his arrival in Mexico, Ali registered for CBP One. After attempting to secure an appointment for several weeks, he received one on or around January 6, 2025, to present at the Nogales port of entry on January 23, 2025. Ali spent approximately 9,000 Mexican pesos to travel to Nogales and presented at the POE for his appointment, but U.S. immigration officials told him the CBP One program was canceled and turned him away. He returned to the POE over the next week to try to seek asylum but gave up hope after seeing that no one could get in.

125.   Since his CBP One appointment was canceled, Ali has struggled with depression. Unable to speak Spanish and without support, he feels unsafe. Ali missed the 30-day deadline to apply for asylum in Mexico. If forced to return to Afghanistan, he fears that he would be killed.

126.   **Harm to Eduardo Doe.** Eduardo Doe fled Venezuela in November 2024 because police and military officials threatened to detain and kill him. An active

senior colonel in the Venezuelan National Guard ordered Eduardo to attend a rally in support of the current Maduro regime, but he refused to comply and immediately left the country. After leaving, he learned that some acquaintances who had also refused to attend the rally were detained before they could escape the country. After a harrowing journey through the Darién Gap, Eduardo was abducted by cartel members almost immediately upon his arrival in Chiapas, Mexico. He was held for two weeks, brutally tortured, and threatened with indefinite detention.

127.    After managing to escape from his kidnappers, Eduardo made his way to Tapachula, where he went into hiding while making daily attempts to secure a CBP One appointment. On January 3, 2025, Eduardo received confirmation that he had secured an appointment at the San Ysidro POE on January 21, 2025. He left Tapachula for Tijuana around January 16, 2025, but received notification on January 20, 2025, that his appointment had been canceled. On or around January 21, 2025, Eduardo attempted to approach the San Ysidro POE, but Mexican officials blocked him before he reached the border.

128.    Since then, Eduardo has lived in a shelter in Tijuana, where he struggles to survive. He has not attempted to return to the POE because he has been told that Mexican officials are detaining people who do so and sending them to Chiapas, where he was previously kidnapped and tortured. The cancelation of his CBP One appointment has taken a toll on Eduardo's mental health, and he lives in a state of constant fear that he may be kidnapped again. He missed the 30-day deadline to apply for asylum in Mexico. If forced to return to Venezuela, he fears he will be disappeared or killed.

129.    **Harm to Jean Doe.** Jean fled Haiti in October 2017, after individuals who are now members of the Viv Ansanm gang killed his father and threatened him with the same fate. He fled to Chile, where his wife joined him a few months later and where their children were born. Jean and his family subsequently left Chile because they were unable to obtain residency and because Jean feared retaliation for

34

reporting a theft by organized crime.

130.   Following an arduous journey through several countries, Jean and his family reached Mexico City and registered for CBP One in November 2023. They tried every day to get a CBP One appointment. They did not apply for asylum in Mexico because a Mexican immigration official had told Jean that they could not seek asylum in both countries, and they missed the 30-day deadline. On January 1, 2025, Jean and his family finally received a CBP One appointment to present at the Nogales port of entry on January 20, 2025.

131.   Jean and his wife gave up their apartment in Mexico City and paid about 10,000 Mexican pesos to travel to Nogales for their CBP One appointment. On the morning of January 20, 2025, while they were standing in line at the Nogales port of entry, a U.S. immigration official told Jean and his family that the President had blocked CBP One, sent them away, and made clear that they would not be processed if they returned. The family is devastated, demoralized, and struggling financially as a result of the expenses they incurred to travel to the border. They do not feel safe in Mexico, especially after Jean narrowly escaped an armed kidnapping. If forced to return to Haiti, Jean fears that the gang that killed his father will kill him, too.

132.   **Harm to Rous Doe.** Rous fled Venezuela because of abuse based on her sexual orientation and perceived gender identity. Both the Venezuelan police and National Guard members subjected her to verbal slurs, beatings, threats, and harassment on countless occasions because she presented as an effeminate gay man. When she tried to file complaints with both agencies, they laughed and threatened to detain her so that she would be raped in jail. In 2019, National Guard members singled Rous out at a checkpoint, called her "faggot," and destroyed her passport. Fearing that the authorities would subject her to additional harm, she avoided leaving her house and later fled to Colombia.

133.   During her time in Colombia, Rous began to present as a woman, but still faced discrimination, including denial of work, based on her gender identity.

Desperate to find safety, she decided to brave the journey through the Darién Gap to seek protection in the United States.

134.   Soon after reaching Tapachula in November 2024, Rous registered for CBP One. In order to do so, she had to buy a new phone and phone chip that could support the CBP One app. Due to these expenses, she had very little money for food. On January 4, 2025, Rous received an appointment for January 23, 2025, at the Nogales port of entry.

135.   On January 19, 2025, while traveling by bus to Nogales for her CBP One appointment, Rous was kidnapped by individuals who appeared to be Mexican officials and held for seven weeks. While detained, Rous learned from another hostage that all CBP One appointments had been canceled. Since her release, she has been extremely traumatized. Rous missed the 30-day deadline to apply for asylum in Mexico. She fears that she may be kidnapped again or otherwise targeted because she is transgender.

136.   **Harm to Diana Doe.** Diana has been attempting to flee Mexico since members of the *Familia Michoacana* cartel killed and dismembered her son after she failed to comply with their extortion demands. The cartel has continued to make death threats against Diana, her partner, and her surviving children.

137.   After she and her family arrived in Tijuana in March 2024, Diana registered for the CBP One app. Although she requested an appointment every day for many months, she did not receive one prior to the cancelation of CBP One.

138.   Stranded in a shelter near the border, Diana and her family are afraid even to go outside for fear that members of the cartel will find them. They have not approached a port of entry to request asylum due to the threat posed by the cartel. Since the cancelation of CBP One, Diana has been suffering physically and mentally. She is depressed, still grieving the loss of her son under horrific circumstances.

139.   **Harm to Nikolai Zolotov.** Nikolai Zolotov fled Russia around February 2023 to escape discrimination, harassment, and physical harm based on his sexual

orientation and identity as a gay man. After Nikolai participated in a protest against a homophobic law, Russian authorities arrested him for promoting "LGBT propaganda" and forced him to pay a fine. His brother threatened to kill him or send him to the army where he would be raped. After leaving Russia, Nikolai attempted to apply for asylum in Argentina, but his asylum interview was canceled multiple times and his application was never adjudicated.

140.   Nikolai traveled to Mexico in March 2024 when he heard about the CBP One app. He registered for CBP One and unsuccessfully attempted to secure an appointment every day until the app was terminated on January 20, 2025. He encountered problems with the app, including the erasure of his registration, but was repeatedly denied assistance when he sought help from CBP, both in person and by reaching out to the CBP One office.

141.   The cancelation of CBP One has seriously impacted Nikolai's mental health. He has trouble sleeping and experiences frequent nightmares. Nikolai has been harassed and threatened in Mexico, including by a violent shelter manager who abused his position of power. Nikolai has also witnessed extremely violent cartel activity. Due to the harassment he has experienced and the pervasive targeting of migrants by police and cartels in Mexico, he stays indoors most of the time and walks in busier areas if he must be out. He has not applied for asylum in Mexico because he does not feel safe there. Furthermore, Nikolai has missed the 30-day deadline to apply for asylum in Mexico. With no status in Mexico and no ability to speak Spanish, he is struggling emotionally and financially. If forced to return to Russia, he fears for his life.

142.   **Harm to Anahi Doe.** Anahi Doe fled Guatemala at the age of 18 after being subjected to violence and discrimination throughout her life for being perceived as gay. Her father abused her so severely that she feared for her life. She is currently undergoing hormone therapy to finally be able to live as a woman, consistent with her gender identity.

143.    Anahi reached Tapachula, Mexico in September 2016. She fled Tapachula in 2020 after being repeatedly threatened and harassed by armed gang members who thought she had reported their illegal activities, and moved to Tijuana.

144.    After leaving an abusive relationship with a man in Tijuana, Anahi took refuge in a shelter, where she registered for the CBP One app in 2024 to seek asylum in the United States. Despite daily attempts to obtain an appointment, Anahi never received one before Defendants ended the use of CBP One for scheduling.

145.    The termination of CBP One has taken a toll on Anahi's mental health, and she is experiencing depression. She does not feel safe in Mexico due to the discrimination and harassment she has faced for being transgender, and she fears her abusive ex-partner could find her.

146.    **Harm to Dragon Doe.** Dragon fled Ecuador in November 2024 after receiving death threats from the Revolutionary Armed Forces of Colombia (FARC). Although he reported the threats to the prosecutor's office, the Ecuadorian government took no steps to protect him.

147.    Dragon reached Mexico around November 20, 2024, and made his way to Hidalgo, where he registered for the CBP One app. Although he attempted to secure a CBP One appointment every day for nearly two months, he never received one. Confused by the process and having receiving error messages on the CBP One app, Dragon traveled to Nogales on or around January 18, 2025. He attempted to approach the Nogales port of entry to seek asylum, but a Mexican police officer outside the port told him that the United States was not letting anyone cross the border. He continued trying to get a CBP One appointment until Defendants terminated the use of the app for scheduling.

148.    Dragon missed the 30-day deadline to apply for asylum in Mexico, where he remains stranded and without protection. Since CBP One was canceled, he has felt completely dejected. If he is forced to return to Ecuador, he fears he will be killed.

149. **Harm to Al Otro Lado.** Defendants' policies and actions have interfered with AOL's core work of assisting migrant populations on both sides of the U.S.-Mexico border in understanding, accessing, and navigating the complex asylum system in the United States. The Proclamation, the Asylum Shutdown Policy, and their implementation, as well as the CBP One Cancelation, have impaired AOL's ability to provide legal education, accompaniment, and direct representation to its clients by closing all pathways for people to access the U.S. asylum process.

150. AOL has long provided stop-gap humanitarian assistance to individuals temporarily stranded in northern Mexico due to the harmful effects of restrictive U.S. asylum policies. However, the nature and scope of these individuals' needs have fundamentally shifted as a result of the Proclamation, the Asylum Shutdown Policy, and the CBP One Cancelation. Prior to January 20, 2025, asylum seekers required access to information regarding the U.S. asylum system, accompaniment to POEs, and temporary assistance with basic needs while they were waiting in Mexico. Now, to meet the needs of the populations it serves, AOL must attempt to provide assistance with legal needs, in finding long-term housing, securing employment, enrolling children in school, and obtaining medical care—all in Mexico. AOL's clients frequently fall ill due to unsanitary and precarious conditions and a lack of basic necessities, experience violence at the hands of criminal groups and Mexican officials, and even die while waiting indefinitely to seek asylum in the United States.

151. To reach the people most impacted by Defendants' actions, AOL had to develop and implement a new risk assessment survey to identify vulnerable individuals, provide them with information about the Asylum Shutdown Policy and CBP One Cancelation, and connect them with the support services they need to survive in Mexico. Facilitating the long-term care and integration of clients stranded permanently in Mexico and coordinating with Mexican organizations requires large amounts of staff time that would otherwise be allocated to providing direct services to people seeking asylum in the United States.

152.   The decrease in asylum seekers in the United States resulting from Defendants' actions has also threatened AOL's existing funding streams and its contracts for domestic work. Much of AOL's funding for U.S.-based legal representation and services requires it to meet quantitative metrics, which have become much harder to attain given the shutdown of all means of accessing the U.S. asylum system at POEs.

153.   AOL routinely submits comments on proposed federal rules that impact its client population. Defendants' failure to provide an opportunity to submit comments on the CBP One Cancelation have harmed AOL by depriving it of the ability to advocate for the interests of the communities that it serves.

154.   As a result of Defendants' actions, AOL staff and leadership have suffered the painful emotional burden of watching their clients suffer and sometimes die for lack of access to the U.S. asylum process.

155.   **Harm to Haitian Bridge Alliance.** Defendants' actions have concretely and perceptibly impaired both the legal and humanitarian services that HBA provides. The Proclamation, the Asylum Shutdown Policy, and their implementation, as well as the CBP One Cancelation, have prevented HBA from engaging in its core work of welcoming recently arrived Black migrants to the United States by providing them with legal and humanitarian assistance. Since its founding, HBA has provided legal representation and immigration counseling, as well as a full range of humanitarian services and referrals, to that population. However, HBA's welcoming work has suffered significant setbacks as the number of Black migrants arriving in the country has fallen precipitously because of Defendants' policies ending all access to asylum at POEs. This includes layoffs of four individuals contracted to do the domestic work of assisting recently arrived clients.

156.   The Asylum Shutdown Policy has also frustrated HBA's core U.S.-based work by creating a humanitarian disaster and causing immense panic among the organization's confused and desperate clients in Mexico. Thousands of

Black migrants have flooded HBA with inquiries and concerns about their legal options, causing HBA to struggle to meet their needs for counseling and accurate information about the state of asylum in the United States. The need to focus resources on the vulnerable client population stuck at the border has also forced HBA to reduce some of its core work meeting the economic and living needs of Haitian immigrants already in the country.

157.    Additionally, the closure of POEs to asylum seekers has interfered with HBA's ability to provide meaningful legal and humanitarian services at the border, as the acute humanitarian needs of their client population have increased. Since January 20, 2025, at least two of HBA's clients have died while waiting to access asylum in Mexico, and many others are suffering from critical medical problems; previously, HBA would have assisted such individuals by filing parole applications or accompanying them to present at POEs in order to try to save their lives. Moreover, numerous clients have reported experiencing pressing physical and psychological ailments brought on by the dangerous and discriminatory conditions in Mexico and the stress of having no recourse to seek safety in the United States. This includes women with high-risk pregnancies who have had miscarriages, children suffering from malnutrition and heat exhaustion, other people who have suffered heart attacks, and even one client who went mute. HBA cannot effectively assist community members who have experienced extreme violence, medical emergencies, and even death because they have been permanently stranded in Mexico.

158.    HBA routinely submits comments on proposed federal rules that impact its client population. Defendants' failure to provide an opportunity to submit comments on the CBP One Cancelation have harmed the organization by depriving it of the ability to advocate for the interests of the communities that it serves.

159.    HBA is deeply committed to supporting the Haitian and Black migrant communities around the U.S.-Mexico border, but there is widespread fear within the organization that it will not be able to meet its goals or effectively serve as a lifeline

and advocate for migrant communities if Defendants' actions remain in effect.

## VI.    CLASS ACTION ALLEGATIONS

160.    Alongside the Organizational Plaintiffs, the Individual Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2) on behalf of themselves and all other persons similarly situated. The proposed class ("Asylum Class") is defined as follows:

> All noncitizens who, on or after January 20, 2025, have sought or will seek to present themselves at a Class A POE on the U.S.-Mexico border to seek asylum; who were or will be prevented from accessing the U.S. asylum process by or at the direction of Defendants based on the Proclamation or the Asylum Shutdown Policy; who continue to seek access to the U.S. asylum process; and who are not physically present in the United States.

161.    Plaintiffs also propose the following subclass (the "CBP One Subclass"):

> All noncitizens who received appointments through the CBP One app to present themselves at a Class A POE on the U.S.-Mexico border; whose appointments were canceled by Defendants on January 20, 2025; who continue to seek access to the U.S. asylum process; and who are not physically present in the United States.

162.    **Fed. R. Civ. P. 23(a)(1) – Numerosity.** The Asylum Class and the CBP One Subclass are so numerous that joinder of all class members is impractical. Pursuant to the Proclamation, the Asylum Shutdown Policy, and the CBP One Cancelation, Defendants have prevented thousands of noncitizens from accessing the U.S. asylum process at POEs and deprived them of their statutory right to apply for asylum. Moreover, class members are geographically dispersed along the U.S.-Mexico border, making joinder of all class members impractical. Based on Defendants' prior practices relating to CBP One appointments, there are approximately 30,000 potential members of the CBP One Subclass alone, who are readily identifiable by Defendants.

163.    **Fed. R. Civ. P. 23(a)(2) – Commonality.** There are numerous questions of law and fact common to the proposed Asylum Class and CBP One Subclass. The legality of the Proclamation, the Asylum Shutdown Policy, and the CBP One

Cancelation are systemic questions capable of common proof. Questions of law and fact that are common to the proposed Asylum Class include whether (a) Defendants unlawfully prevented the class members from presenting themselves at a POE to seek asylum; and (b) Defendants' actions violate the INA or the APA and/or are ultra vires.

164.    Questions of law and fact that are common to the proposed CBP One Subclass include whether (a) Defendants' cancelation of putative CBP One Subclass members' appointments despite their significant reliance interests was arbitrary and capricious; and (b) Defendants violated the APA's procedural requirements by canceling CBP One appointments without notice or explanation.

165.    Even if there are "different factual circumstances between each class member's particular experience," that "does not destroy commonality because there is still a common underlying legal question regarding whether each and every class member was illegally denied access to the asylum system because of the Defendants' overarching policy." *Al Otro Lado, Inc. v. Wolf*, 336 F.R.D. 494, 503 (S.D. Cal. 2020).

166.    **Fed. R. Civ. P. 23(a)(3) – Typicality.** Individual Plaintiffs' claims are reasonably coextensive with those of the proposed Asylum Class because the Individual Plaintiffs, like all proposed Asylum Class members, were or will be denied access to the U.S. asylum process based on Defendants' unlawful actions in implementing the Proclamation and the Asylum Shutdown Policy. The Individual Plaintiffs representing the CBP One Subclass, like all CBP One Subclass members, have been injured by the CBP One Cancelation because, in reliance on Defendants' instructions, they waited in Mexico under dangerous conditions to obtain CBP One appointments, risked forfeiting the opportunity to seek asylum in Mexico, and incurred related travel and other expenses.

167.    **Fed. R. Civ. P. 23(a)(4) – Adequacy.** Individual Plaintiffs will fairly and adequately protect the interests of the class members they seek to represent.

43

Individual Plaintiffs will pursue this action vigorously through qualified counsel on behalf of the Asylum Class and, where relevant, the CBP One Subclass. None of the Individual Plaintiffs have antagonistic or conflicting interests. Rather, they all share a common interest in enjoining and/or vacating the Proclamation, the Asylum Shutdown Policy, and/or the CBP One Cancelation, and being able to access the U.S. asylum process at a POE along the U.S.-Mexico border. Furthermore, Plaintiffs' counsel will adequately protect the interests of the class because they have demonstrated expertise in litigating class actions, including challenges to Defendants' immigration policies, and have dedicated significant resources to litigating this matter.

168.  **Fed. R. Civ. P. 23(b)(2).** The Asylum Class and the CBP One Subclass should also be certified because Defendants have acted or refused to act on grounds that apply generally to the proposed class and subclass, rendering injunctive and declaratory relief appropriate as to the Asylum Class and CBP One Subclass as a whole. Specifically, Defendants have implemented, enforced, and perpetuated the Proclamation and Asylum Shutdown Policy at POEs on the U.S.-Mexico border with respect to all proposed Asylum Class members. Similarly, Defendants have implemented the CBP One Cancelation with respect to all proposed CBP One Subclass members. Pursuant to these executive actions, Defendants have deprived Individual Plaintiffs and putative class members of access to the asylum process at POEs on the U.S.-Mexico border in violation of the INA and the APA and in excess of their authority.

### VII.   CAUSES OF ACTION
### FIRST CLAIM FOR RELIEF
### Violation of the Immigration and Nationality Act,
### 8 U.S.C. § 1158
### (All Plaintiffs Against All Defendants)

169.  Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

170.  The INA codifies the right of noncitizens to come to land POEs and seek

asylum. 8 U.S.C. § 1158(a)(1) provides that any noncitizen "who is physically present in the United States or who arrives in the United States . . . at a designated port of arrival" has the right to seek asylum, regardless of such individual's immigration status.

171.    The Proclamation, the Asylum Shutdown Policy, and their implementation violate 8 U.S.C. § 1158 by depriving noncitizens of the ability to access the U.S. asylum process at POEs.

172.    None of the sources of law on which the Proclamation or the Asylum Shutdown Policy rely—the Proclamation itself, 8 U.S.C. § 1182(a)(1)-(3), INA § 212(f), INA § 215(a)(1), or the U.S. Constitution—authorizes CBP officers or their agents to violate § 1158 by preventing asylum seekers from accessing the asylum process at POEs.

173.    CBP officers, in coordination with Mexican authorities, implemented the Proclamation and the Asylum Shutdown Policy at the instigation, under the control or authority, or with the knowledge, consent, direction, and/or acquiescence of Defendants.

174.    Plaintiffs have a non-statutory right of action to have Defendants' actions declared unlawful and enjoined.

175.    By implementing the Proclamation and the Asylum Shutdown Policy, Defendants have irreparably injured Individual Plaintiffs by depriving them of access to the asylum process and by forcing them to wait indefinitely in Mexico, where they risk serious harm.

176.    In addition, by implementing the Proclamation and the Asylum Shutdown Policy, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by interfering with their core activities.

## SECOND CLAIM FOR RELIEF
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), Contrary to Law**
**(All Plaintiffs Against All Defendants Except President Trump)**

177.  Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

178.  The APA requires courts to hold unlawful and set aside any agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

179.  The Asylum Shutdown Policy is a final agency action under 5 U.S.C. § 704.

180.  The INA codifies the right of noncitizens to come to POEs and seek asylum. 8 U.S.C. § 1158(a)(1) provides that any noncitizen "who is physically present in the United States or who arrives in the United States . . . at a designated port of arrival" has the right to seek asylum, regardless of such individual's immigration status.

181.  The Asylum Shutdown Policy violates § 1158(a)(1) and APA § 706(2)(A) and (C) because it deprives noncitizens of the ability to access the U.S. asylum process at POEs and purports to impose requirements upon asylum seekers that Congress chose to omit from § 1158(a).

182.  None of the sources of law on which the Asylum Shutdown Policy relies—the Proclamation, 8 U.S.C. § 1182(a)(1)-(3), INA § 212(f), INA § 215(a)(1), or the U.S. Constitution—authorizes CBP officers or their agents to violate or abrogate § 1158 by preventing asylum seekers from accessing the asylum process at POEs.

183.  CBP officers, in coordination with Mexican authorities, implemented the Asylum Shutdown Policy at the instigation, under the control or authority, or with the knowledge, consent, direction, and/or acquiescence of Defendants.

184.  By implementing the Asylum Shutdown Policy, Defendants have

irreparably injured Individual Plaintiffs by depriving them of access to the asylum process and by forcing them to wait indefinitely in Mexico, where they risk serious harm.

185.   In addition, by implementing the Asylum Shutdown Policy, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by interfering with their core activities.

### THIRD CLAIM FOR RELIEF
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Arbitrary & Capricious
### (All Plaintiffs Against All Defendants Except President Trump)

186.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

187.   The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

188.   The Asylum Shutdown Policy is a final agency action under 5 U.S.C. § 704.

189.   The Asylum Shutdown Policy is arbitrary and capricious. Defendants have failed to articulate a reasoned explanation for their actions; relied on factors Congress did not intend to be considered; failed to consider important aspects of the problem; and offered explanations for their actions that run counter to the evidence before the agencies.

190.   CBP officers, in coordination with Mexican authorities, implemented the Asylum Shutdown Policy at the instigation, under the control or authority, or with the knowledge, consent, direction, and/or acquiescence of Defendants.

191.   By implementing the Asylum Shutdown Policy, Defendants have irreparably injured Individual Plaintiffs by depriving them of access to the U.S. asylum process and by forcing them to wait indefinitely in Mexico, where they risk serious harm.

192.    In addition, by implementing the Asylum Shutdown Policy, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by interfering with their core activities.

**FOURTH CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2)(D),**
**Agency Action Without Observance of Procedure Required By Law**
**(Plaintiffs Maria Doe, Jessica Doe, Rous Doe, Jean Doe, Fernando Doe, Ali**
**Doe, and Eduardo Doe, on behalf of the CBP One Subclass, and the**
**Organizational Plaintiffs Against All Defendants Except President Trump)**

193.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

194.    The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

195.    Pursuant to the Government's Circumvention of Lawful Pathways and Securing the Border Rules, CBP One has been virtually the exclusive means for noncitizens approaching Class A POEs to seek asylum since May 2023.

196.    The CBP One Cancelation—the decision to cancel all scheduled CBP One appointments—amounts to final agency action under 5 U.S.C. § 704.

197.    Under the APA, agency action that, *inter alia*, alters the rights and obligations of parties, is considered a "legislative rule." 5 U.S.C. §§ 553, 706(2)(D). The CBP One Cancelation is a legislative rule, under which DHS and CBP categorically canceled all preexisting CBP One appointments, thereby eliminating the ability of thousands of individuals to seek asylum at Class A POEs along the U.S.-Mexico border.

198.    A "legislative rule" must undergo notice and comment. 5 U.S.C. §§ 553, 706(2)(D). Because the Government created the legal framework that made appointments obtained through CBP One the sole mechanism for seeking asylum at POEs through a legislative rule, Defendants were required to engage in notice-and-comment rulemaking to terminate the use of CBP One for this purpose.

Defendants failed to follow notice-and-comment rulemaking procedures prior to the CBP One Cancelation.

199.   As a result of Defendants' actions constituting violations of APA §§ 553 and 706(2), Defendants have irreparably injured both the Individual and Organizational Plaintiffs by depriving them of the opportunity to participate in the rulemaking process.

**FIFTH CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A),**
**Arbitrary and Capricious**
**(Plaintiffs Maria Doe, Jessica Doe, Rous Doe, Jean Doe, Fernando Doe, Ali Doe, and Eduardo Doe, on behalf of the CBP One Subclass, Against All Defendants Except President Trump)**

200.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

201.   The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

202.   Pursuant to the Government's Circumvention of Lawful Pathways and Securing the Border Rules, CBP One has been virtually the exclusive means for noncitizens approaching Class A POEs to seek asylum since May 2023.

203.   In reliance on the Government's representations that noncitizens who made CBP One appointments would be able to seek asylum in the United States, the CBP One Subclass used the CBP One app to schedule appointments at POEs; incurred related travel and other expenses; spent months waiting in Mexico in precarious circumstances; and risked forfeiting the opportunity to seek asylum in Mexico.

204.   The CBP One Cancelation—the decision to cancel all pending CBP One appointments—amounts to final agency action under 5 U.S.C. § 704.

205.   The CBP One Cancelation is arbitrary and capricious. In canceling scheduled CBP One appointments, Defendants failed to articulate a reasoned

explanation for their decision, which constituted a departure from prior agency policy; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency.

206.  Prior to the CBP One Cancelation, Defendants did not consider the reliance interests of the people who had obtained appointments via CBP One.

207.  As a result of Defendants' acts constituting violations of APA § 706(2)(A), Defendants have irreparably injured the CBP One Subclass by depriving them of access to the U.S. asylum process and forcing them to wait indefinitely in Mexico, where they face a risk of serious harm.

**SIXTH CLAIM FOR RELIEF**
**Ultra Vires Action**
**(All Plaintiffs Against All Defendants)**

208.  Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

209.  There is no statute, constitutional provision, or other source of law that authorizes the Proclamation or the Asylum Shutdown Policy. Defendants' actions specifically violate existing laws passed by Congress.

210.  Plaintiffs have a non-statutory right of action to have Defendants' actions declared unlawful and enjoined.

211.  By implementing the Proclamation and the Asylum Shutdown Policy, Defendants have irreparably injured Individual Plaintiffs by depriving them of access to the U.S. asylum process and by forcing them to wait indefinitely in Mexico, where they risk serious harm.

212.  In addition, by implementing the Proclamation and the Asylum Shutdown Policy, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by interfering with their core activities.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

(1)  Certify the Asylum Class and CBP One Subclass defined in this Complaint pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2);

(2)  Appoint all Individual Plaintiffs as representatives of the Asylum Class and appoint Plaintiffs Maria Doe, Jessica Doe, Rous Doe, Jean Doe, Fernando Doe, Ali Doe, and Eduardo Doe as representatives of the CBP One Subclass;

(3)  Appoint the undersigned counsel to serve as class counsel pursuant to Fed. R. Civ. P. 23(g);

(4)  Declare that the Proclamation and its implementation, to the extent they provide the basis for blocking Asylum Class members from accessing POEs to seek asylum, exceed Defendants' authority and are unlawful because they violate 8 U.S.C. § 1158;

(5)  Declare that the Asylum Shutdown Policy and its implementation exceed Defendants' authority and are unlawful because they violate 5 U.S.C. § 706(2) and 8 U.S.C. § 1158;

(6)  Declare that § 1182(a)(1)-(3) cannot be used as a basis to deny access to the U.S. asylum process;

(7)  Declare that Defendants' decision to cancel the CBP One Subclass's appointments to present at POEs was arbitrary and capricious, in violation of 5 U.S.C. § 706(2);

(8)  Declare that Defendants' failure to follow notice-and-comment rulemaking procedures prior to the CBP One Cancelation violated 5 U.S.C. § 706(2)(D);

(9)  Enjoin Defendants from implementing the Proclamation, to the extent the Proclamation provides the basis for blocking Asylum Class members from accessing POE to seek asylum;

(10) Enjoin Defendants from implementing the Asylum Shutdown Policy;

(11) Pursuant to 5 U.S.C. § 705, postpone the effective date of all agency action implementing the Proclamation, the Asylum Shutdown Policy, and the CBP One Cancelation pending a final decision in this case;

(12) Hold unlawful and set aside the Asylum Shutdown Policy;

(13) Hold unlawful and set aside the CBP One Cancelation and restore access to the asylum process at POEs for the CBP One Subclass;

(14) Declare that Defendants unlawfully deprived the Asylum Class, including the CBP One Subclass, of access to the U.S. asylum process at POEs;

(15) Order Defendants to restore access to the U.S. asylum process at POEs for the Asylum Class, including the CBP One Subclass;

(16) Award Plaintiffs their reasonable attorneys' fees, costs, and other expenses pursuant to 28 U.S.C. § 2412 and any other applicable law; and

(17) Grant any and all such other relief as the Court deems just and equitable.

1    Dated: June 11, 2025                    Respectfully Submitted,

2
                                            MORRISON & FOERSTER LLP
3

4
                                            */s/ Eric M. Acker*
5                                           Attorney for Plaintiff
                                            *EAcker@mofo.com*
6                                           Eric M. Acker
                                            Krista S. deBoer
7                                           Robert W. Manoso*

8                                           CENTER FOR GENDER AND
                                            REFUGEE STUDIES
9                                           Melissa Crow*
                                            Blaine Bookey
10                                          Robert Pauw*
                                            Peter Habib
11
                                            CENTER FOR CONSTITUTIONAL
12                                          RIGHTS
                                            Baher Azmy*
13                                          Angelo Guisado*
                                            Adina Marx-Arpadi*
14
                                            AMERICAN IMMIGRATION
15                                          COUNCIL
                                            Michelle Lapointe*
16                                          Rebecca Cassler*
                                            Suchita Mathur*
17
                                            DEMOCRACY FORWARD
18                                          FOUNDATION
                                            Brian Netter*
19                                          Sarah M. Rich*
                                            Adnan Perwez*
20

21

22

23

24

25

26

27

28