1   ADAM GORDON
    United States Attorney
2   ERNEST CORDERO, JR.
    Assistant U.S. Attorney
3   California Bar No. 131865
    KELLY A. REIS
4   Assistant U.S. Attorney
    California Bar No. 334496
5   Office of the United States Attorney
    880 Front Street, Room 6293
6   San Diego, CA 92101-8893
    Telephone: (619) 546-7578
7   Email: ernest.cordero@usdoj.gov

8   Attorneys for Defendants

9
                **UNITED STATES DISTRICT COURT**
10
            **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
11

12  AL OTRO LADO, Inc., *et al.*,          Case No. 3:25-cv-1501-RBM-BLM

13
                        Plaintiffs,        **DEFENDANTS' MOTION TO**
14                                         **DISMISS PLAINTIFFS'**
                                           **COMPLAINT AND**
15          v.                             **MEMORANDUM**
                                           **OF POINTS AND AUTHORITIES**
16  DONALD J. TRUMP, President of the      **IN SUPPORT THEREOF**
17  United States, in his official capacity, *et al.*,

18                      Defendants.        DATE: November 3, 2025

19
                                           Hon. Ruth Bermudez Montenegro
20
21                                         **NO ORAL ARGUMENT UNLESS**
                                           **ORDERED BY THE COURT**
22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE

I.      Introduction ........................................................................................1

II.     The Complaint's Relevant Allegations ......................................................4

III.    Argument ............................................................................................6

    A.    The Organizations' claims fail at the threshold and
should be dismissed ........................................................................6

        1.    The Organizatons lack Article III standing................................6

        2.    The Organizations are not within the relevant
zone of interests ........................................................10

    B.    Plaintiffs' challenge to the Proclamation is not justiciable................12

        1.    The Court lacks jurisdiction to hear challenges to the
President's authority under 8 U.S.C. § 1182(f) ........................12

        2.    Plaintiffs cannot seek equitable relief against the President.....13

        3.    Plaintiffs cannot challenge the Proclamation under the APA ..14

    C.    There is no right to asylum for aliens outside the United States
particularly where entry is suspended ................................................16

    D.    Plaintiffs fail to state viable claims for relief ......................................19

        1.    Plaintiffs' 1st Claim for violation of the INA is defective .......19

        2.    Plaintiffs' 2nd Claim for violation of the APA is defective .....19

        3.    Plaintiffs' 3rd Claim for violation of the APA is defective......20

        4.    Plaintiffs' 4th Claim fails because the cancellation of CBP One
Appointments does not require notice-and-comment...............21

        5.    Plaintiffs' 5th Claim is defective because the cancellation of
CBP One Appointments is unreviewable under the APA ........23

        6.    Plaintiffs' 6th Claim fails because the Proclamation is within
the President's statutory authority. ...........................................24

IV.     Conclusion ........................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE**

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
    138 F.4th 1102 (9th Cir. 2025) ..................................................................16

*Air Courier Conference of Am. v. Am. Postal Workers Union*,
    498 U.S. 517 (1991)......................................................................................11

*Al Otro Lado, Inc. v. Nielsen*,
    327 F. Supp. 3d 1284 (S.D. Cal. 2018).......................................................11

*Allen v. Milas*,
    896 F.3d 1094 (9th Cir. 2018) .....................................................................15

*Am. Ass'n of Exporters v. United States*,
    751 F.2d 1239 (Fed. Cir. 1985) ..................................................................23

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003)......................................................................................18

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*,
    738 F.3d 387 (D.C. Cir. 2013).....................................................................15

*Ariz. All. for Retired Americans v. Mayes*,
    117 F.4th 1165 (9th Cir. 2024) ....................................................................10

*Arizona v. United States*,
    567 U.S. 387 (2012)......................................................................................24

*Bark v. U.S. Forest Service*,
    37 F. Supp. 3d 41 (D.D.C. 2014).................................................................20

*Bennett v. Spear*,
    520 U.S. 154 (1997)................................................................................23, 24

*Biden v. Texas*,
    597 U.S. 785 (2022)......................................................................................14

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984)......................................................................................11

*Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999)...................................................................13

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987)................................................................................................11

*Coal. on Homelessness v. City & Cnty. of San Francisco*,
    758 F. Supp. 3d 1102 (N.D. Cal. 2024)................................................................8

*Colwell v. Dep't of Health & Human Servs.*,
    558 F.3d 1112 (9th Cir. 2009)............................................................................21

*Ctr. for Biological Diversity v. Haaland*,
    58 F.4th 412 (9th Cir. 2023)...............................................................................24

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018)........................................................................14, 18

*Erringer v. Thompson*,
    371 F.3d 625 (9th Cir. 2004)..............................................................................21

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024)..........................................................................6, 8, 9, 10

*Fiallo v. Bell*,
    430 U.S. 787 (1977)....................................................................................12, 18

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)............................................................................................14

*Gill v. Whitford*,
    585 U.S. 48 (2018)................................................................................................7

*Graham v. FEMA*,
    149 F.3d 997 (9th Cir. 1998)..............................................................................19

*Griffith v. FLRA*,
    842 F.2d 487 (D.C. Cir. 1988)...........................................................................25

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)........................................................................................6, 8

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017)..............................................................................13

*Heckler v. Chaney*,
    470 U.S. 821 (1985)......................................................................................21, 24

*Immigrant Defenders Law Center v. Noem*,
    145 F. 4th 972 (9th Cir. 2025) .......................................................................... 10

*In re A Cmty. Voice*,
    878 F.3d 779 (9th Cir. 2017) ........................................................................... 22

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) .......................................................................... 15

*James V. Hurson Assocs., Inc. v. Glickman*,
    229 F.3d 277 (D.C. Cir. 2000) .......................................................................... 22

*Kerry v. Din*,
    576 U.S. 86 (2015) .................................................................................. 18, 25

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ....................................................................................... 12

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) ....................................................................................... 25

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ......................................................................................... 7

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................... 6, 9

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) ......................................................................... 21

*Mary Ferrell Found., Inc. v. Biden*,
    No. 22-cv-06176-RS, 2023 WL 4551066 (N.D. Cal. July 14, 2023) ................ 13

*Mississippi v. Johnson*,
    71 U.S. 475 (1867) ........................................................................................... 3

*Nat'l Min. Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) .......................................................................... 22

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) .................................................................... 3, 13

*Ninilchik Traditional Council v. United States*,
    227 F.3d 1186 (9th Cir. 2000) ......................................................................... 19

*Nishimura Ekiu v. United States*,
   142 U.S. 651 (1892)...................................................................................12

*Norton v. S. Utah Wilderness Alliance*,
   542 U.S. 55 (2004)............................................................................19, 20

*Novak v. United States,*
   795 F.3d 1012 (9th Cir. 2015) ...............................................................19

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984)..................................................................................25

*Rosebud Sioux Tribe v. Trump*,
   428 F. Supp. 3d 282 (D. Mont. 2019)....................................................13

*S. Cal. Edison Co. v. FERC*,
   770 F.2d 779 (9th Cir. 1985) ...........................................................21, 22

*Sacora v. Thomas*,
   628 F.3d 1059 (9th Cir. 2010) ...............................................................21

*Sale v. Haitian Centers Council, Inc.*,
   509 U.S. 155 (1993)......................................................................1, 3, 16, 17

*Sequoia Orange Co. v. Yeutter*,
   973 F.3d 752 (9th Cir. 1992) .................................................................21

*Shaughnessy v. United States ex rel. Mezei*,
   345 U.S. 206 (1953)................................................................................12

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019)..................................................................19

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)..................................................................................14

*Swanson Grp. Mfg. LLC v. Jewell*,
   790 F.3d 235 (D.C. Cir. 2015).................................................................9

*Terveer v. Billington*,
   34 F. Supp. 3d 100 (D.D.C. 2014)..........................................................24

*Trump v. Hawaii*,
   585 U.S. 667 (2018)........................................................................4, 13, 15, 17

*Ukiah Valley Med. Ctr. v. FTC*,
   911 F.2d 261 (9th Cir. 1990) ................................................................23

*United States v. Texas*,
   599 U.S. 670 (2023) ...............................................................7, 8, 14

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ................................................................18, 19

*Viasat, Inc. v. FCC*,
   47 F.4th 769 (D.C. Cir. 2022) ..................................................9

*W. State Univ. of S. Cal. v. Am. Bar Ass'n*,
   301 F. Supp. 2d 1129 (C.D. Cal. 2004) ..........................................20

*Webster v. Doe*,
   486 U.S. 592 ..............................................................................19

*Wild Fish Conservancy v. Jewell*,
   730 F.3d 791 (9th Cir. 2013) ...................................................14, 16

**STATUTES**
5 U.S.C. § 553(a)(1) ........................................................................23
5 U.S.C. § 553(b)(A) ........................................................................21
5 U.S.C. § 701(a)(2) .........................................................15, 21, 24
5 U.S.C. § 702 .........................................................................11, 20
5 U.S.C. § 702(1) ............................................................................15
5 U.S.C. § 704 ................................................................................14
6 U.S.C. § 211(g) .............................................................................5
6 U.S.C. § 111(b)(1) ........................................................................24
8 U.S.C. § 1103(a)(1) .......................................................................24
8 U.S.C. § 1158 ..............................................................................11
8 U.S.C. § 1158(a)(1) .......................................................................16
8 U.S.C. § 1158(d)(7) .......................................................................11
8 U.S.C. § 1182(a)(1) .............................................................2, 4, 5, 6
8 U.S.C. § 1252 ..............................................................................13
8 U.S.C. § 1182(f) ......................................................................passim

**RULES**
Fed. R. Civ. P. 12(b)(1) ....................................................................1
Fed. R. Civ. P. 12(b)(6) ....................................................................1
Fed. R. Civ. P. 12(f) .........................................................................1

**MOTION**

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(f), Defendants move to dismiss Plaintiffs' Complaint, or in the alternative, to strike portions thereof. This motion is based on the following Memorandum of Points and Authorities, as well as all pleadings and filings in this action, and upon any other matters or argument that the Court may permit. Counsel for Plaintiffs and Defendants met and conferred over the motion issues on August 28 and September 2, 2025, but were unable to resolve them.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     Introduction**

This case concerns managing the United States territorial border and efforts by Plaintiffs to require the Department of Homeland Security (DHS) to allow people to cross that border even when precluded by a Presidential proclamation barring entry. There is no merit to these claims, as the President and DHS have ample and appropriate authority to prevent people who are outside the United States from crossing into United States territory.

In this lawsuit, eleven Individual Plaintiffs and two Organizational Plaintiffs[1] assert that DHS may not implement a Presidential Proclamation that prevents aliens who lack any travel or entry documents from crossing the U.S.–Mexico border in order to be inspected at land ports of entry (POE), arguing that these aliens are entitled to be allowed into the country to be placed in removal proceedings where they can then seek asylum. *See* Complaint ("Compl.," ECF No. 1) ¶¶ 1–16, 52–55. This claim fails under well-established precedent of the Supreme Court—*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993)—and should be dismissed.

---

[1] Defendants refer to Maria Doe, Jessica Doe, Fernando Doe, Ali Doe, Eduardo Doe, Jean Doe, Rous Doe, Diana Doe, Nikolai Zolotov, Anahi Doe, and Dragon Doe as the "Individual Plaintiffs." They refer to Organizational Plaintiffs Al Otro Lado, Inc. ("AOL") and Haitian Bridge Alliance ("HBA") collectively as the "Organizations." All Plaintiffs together are referred to as "Plaintiffs."

On January 20, 2025, the President issued Proclamation 10888 (the "Proclamation"), Guaranteeing the States Protection Against Invasion. *See* 90 Fed. Reg. 8333 (Jan. 29, 2025). Pursuant to his authority under 8 U.S.C. §§ 1182(f) and 1185(a), the President determined "that the entry into the United States … of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" 8 U.S.C. § 1182(a)(1)–(3) "is detrimental to the interests of the United States" and thus suspended "entry into the United States of such aliens … ." Proclamation § 3.

As alleged in the Complaint, for about two years prior to the Proclamation, aliens physically located outside the United States, including those who wished to seek asylum, could register with the CBP One mobile app ("CBP One"). Compl. ¶¶ 3, 76. They then could use the app to make appointments to present themselves for inspection at certain POEs along the U.S.–Mexico border. Compl. ¶¶ 3, 76–77. At noon on January 20, 2025—the same day that the President issued the Proclamation suspending entry as well as an Executive Order calling for the discontinuation of the use of CBP One—Defendants cancelled all existing CBP One appointments and disabled the app's appointment-scheduling functionality. *Id*. ¶ 6.

Plaintiffs challenge the cancellation of CBP One appointments, the Proclamation and implementing guidance, and a vaguely defined "Asylum Shutdown Policy." Through their claims, Plaintiffs ask the Court to override the President's judgment. The Court should dismiss Plaintiffs' claims at the outset on several independent jurisdictional and threshold grounds.

The Organizations—who are not directly impacted by the challenged conduct—lack Article III standing to bring this suit, and they are not within the zone of interests of the asylum statute their claims seek to enforce. Indeed, the Immigration and Nationality Act's review scheme leaves no place for lawsuits by immigration- or migrant-services organizations, indicating that Congress intended to preclude such

judicial review. The Individual Plaintiffs also lack standing because their claimed injuries are not redressable, and several of them have failed to show that they have suffered, or will imminently suffer, an injury as a result of the challenged conduct.

Plaintiffs' claims are also not justiciable. The crux of Plaintiffs' lawsuit is a challenge to Section 3 of the Proclamation, which suspends the entry of Individual Plaintiffs and other aliens who fail to provide Federal officials with sufficient medical information and reliable criminal history and background information. The agency guidance attached to the Complaint makes clear that, pursuant to the Proclamation, aliens without valid entry documents or authorizations or who do not provide sufficient medical information or reliable criminal history information are not permitted to cross the international boundary. But, as they are non-resident aliens outside the United States, the Individual Plaintiffs lack any cognizable claim to challenge the denial of their entry. Nor is there any other cause of action by which the Plaintiffs can challenge the Proclamation or its implementation. Even if these justiciability limits are set to the side, Plaintiffs' non-constitutional claims in equity fail because there are no grounds to seek an injunction as to the President's actions, *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867), or any declaratory relief with respect to them, *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010). And their APA claims likewise fail at the threshold because Plaintiffs cannot identify any final agency action that is separate and independent from the President's suspension on entry set forth in the Proclamation.

Plaintiffs' claims challenging their alleged inability to present for inspection at a port of entry also fail as a matter of law. Section 1182(f) expressly authorizes the suspension of entry of classes of aliens that can be enforced by barring people from crossing the border line, regardless of whether they intend to seek asylum. *See, e.g.*, *Sale*, 509 U.S. at 187. While the President's findings cannot properly be reviewed, the Proclamation is adequately supported by the President's finding that the entry of aliens who have not provided advance medical and background information would be

detrimental to the interests of the United States, and raising grave threats to public health, safety, and national security. Section 1182(f) requires no more. *Trump v. Hawaii*, 585 U.S. 667, 686, 704 (2018).

Plaintiffs' claims challenging the cancellation of CBP One appointments are likewise not viable. Because these appointments were procedural mechanisms for managing the flow of entry and provide no substantive rights, notice-and-comment rulemaking was not required before cancelling any CBP One appointments. Similarly, the cancellation of a CBP One appointment is not a final agency action, because the appointment itself created no substantive rights to entry, inspection, processing, or any particular processing outcome (including parole).

For all these reasons, and those discussed below, the Court should dismiss Plaintiffs' Complaint.

## II.    The Complaint's Relevant Allegations

On January 20, 2025, the President took two actions relevant to the issues in this case. First, he issued an Executive Order titled "Securing Our Borders," (the, "Executive Order"), which called for the Department of Homeland Security ("DHS") to "ceas[e] using the 'CBP One' application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States." Executive Order 14165 § 7(a)-(b), 90 Fed. Reg. 8467, 8468 (Jan. 29, 2025); Compl. ¶ 92. In accordance with that Order, DHS removed the scheduling functionality within the CBP One mobile application, effective January 20, 2025, at noon EST, and cancelled existing CBP One appointments. Compl. ¶ 6.

The second Presidential action, Presidential Proclamation 10888, titled "Guaranteeing the States Protection Against Invasion," as relevant here, invokes the President's authorities under the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1182(f) and 1185(a), to preclude the entry of aliens who fail to submit "sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" the inadmissibility provisions of 8 U.S.C.

§ 1182(a)(1)–(3). Proclamation § 3, 90 Fed. Reg. 8333, 8335 (Jan. 29, 2025); Compl. ¶¶ 8–11. The Proclamation explained that "[t]he sheer number of aliens entering the United States has overwhelmed the system and rendered many of the INA's provisions ineffective, including those … intended to prevent aliens posing threats to public health, safety, and national security from entering the United States." 90 Fed. Reg. at 8333. The President emphasized that, "[a]s a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide." *Id*. In a February 28, 2025, memorandum and accompanying muster, CBP provided the Office of Field Operations ("OFO")—the office responsible for conducting CBP's enforcement activities at POEs, 6 U.S.C. § 211(g)—with guidance on the implementation of Section 3 of the Proclamation. ("OFO Guidance"), Compl., Ex. D, USA00022-USA00033. According to the OFO Guidance, the Proclamation, in part, "suspends entry to the U.S. at all ports of entry (POEs) for aliens who fail to provide sufficient medical information and reliable criminal history and background information to enable fulfillment of the requirements [8 U.S.C. §§ 1182(a)(1)–(3)] … ." *Id.* The Guidance provides that "[a]liens subject to the Proclamation shall not be permitted to cross the international boundary." *Id.* Additionally, "[a]n undocumented alien who claims or manifests a fear at the international boundary line to CBP personnel is not excepted from the Proclamation." *Id*.

Plaintiffs contend that the Proclamation, an alleged "Asylum Shutdown Policy"—vaguely defined as a "decision[] … to effectively close southern border POEs to people seeking asylum," Compl. ¶ 13—and the "CBP One Cancellation"—defined as the "decision[] to cancel scheduled CBP One appointments," *id.*—effectively eliminated the ability of aliens physically located outside the United States to access the U.S. asylum process by crossing the U.S. border and entering through POEs along the U.S.–Mexico border. *Id.* ¶¶ 6–12. Their Complaint contains various claims challenging the Proclamation (Claims 1 and 6); the alleged "Asylum Shutdown

Policy" (Claims 1, 2, 3, and 6); and the "CBP One Cancellation" (Claims 4 and 5). Claims 2 through 5 are brought under the Administrative Procedure Act (APA). Claims 1 and 6 assert non-statutory, equitable claims for alleged violation of the INA (Claim 1) and "Ultra Vires" conduct (Claim 6).

The Individual Plaintiffs are aliens of various nationalities who are physically located in Mexico, some of whom had CBP One appointments that were cancelled on January 20. Compl. ¶¶ 114–48. They assert that Defendants' actions have deprived them of "access to the U.S. asylum process and [left] them stranded permanently in Mexico." *Id.* ¶ 14. As for the Organizations, AOL and HBA, they contend that, because aliens are not receiving access to the U.S. asylum process, their efforts to assist those aliens on either side of the border are "impaired." *Id.* ¶ 15.

## III.    Argument

### A.    The Organizations' claims fail at the threshold and should be dismissed.

#### 1.    The Organizations lack Article III standing.

To establish standing, organizations "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 393–94 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Where a regulation does not directly regulate the plaintiff, standing "is ordinarily substantially more difficult to establish." *Alliance*, 602 U.S. at 382 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

Here, the Organizations seek to have the Court declare unlawful, and enjoin the implementation of, the Proclamation, the Executive Order (or the "CBP One Cancelation"), and the alleged "Asylum Shutdown Policy." They claim standing to bring their challenges based on the downstream, indirect impacts on them from the challenged policies. They do not allege any direct exercise of coercive government power directed at them nor do they claim associational standing on behalf of members. In essence, AOL alleges that, because aliens are not being permitted to enter

the United States at POEs, it has shifted its focus to meeting the long-term humanitarian needs of migrants in Mexico. Compl. ¶¶ 35, 150. It also continues to provide a wide variety of services to migrants on both sides of the border. *Id.* ¶¶ 33–34. Without providing any detail, AOL also alleges that its funding streams and contracts for domestic work are "threatened" by Defendants' actions. *Id.* ¶ 35. HBA contends that it has been "prevented from engaging in its core activity of welcoming recently arrived Black migrants with legal and humanitarian assistance" because the number of such migrants has dropped. *Id.* ¶ 37. It also has grown its presence on the U.S.–Mexico border to provide legal and humanitarian assistance to Black migrants waiting in Mexico for an opportunity to seek asylum at U.S. POEs. *Id.*

These downstream, incidental impacts on the Organizations' allocation of services and resources are not the type of "invasion of a legally protected interest" sufficient to support Article III standing. *Gill v. Whitford*, 585 U.S. 48, 65 (2018). The Organizations have not alleged that their services have been directly regulated or perceptibly impaired by the government's actions. Instead, they have shifted the focus of those services to account for the reduction in new migrants crossing the POEs on the border, while increasing the services provided to migrants waiting in Mexico. As alleged in the Complaint, both Organizations provide a wide variety of legal, social, and humanitarian services to their constituent groups. There is no allegation that they cannot find sufficient migrants already in the United States in need of their services.

The Organizations also lack any "judicially cognizable interest" in how the Executive enforces the immigration laws against third parties. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). The Supreme Court reiterated these principles in *United States v. Texas*, 599 U.S. 670 (2023), holding that plaintiff States did not have standing to challenge the Executive's immigration enforcement priorities, even though the States contended that those priorities cost them additional money.

Each of the reasons underlying the Supreme Court's decision in *Texas* are applicable here: the Defendants "do[] not exercise coercive power" over "the

plaintiff[s]," *Texas*, 599 U.S. at 678; challenges to immigration enforcement policies "run up against the Executive's Article II authority to enforce federal law," *id.* (which, here, implicates "foreign-policy objectives," *see id.* at 679); and the courts lack "meaningful standards for assessing" the discretionary exercise of authority to suspend entry or manage intake into POEs, which reflects a complicated balancing of various factors like resource constraints, public safety, and the situation at the southwest border, *id.* at 679–80. Like the States in *Texas*, the Organizations cannot leverage the incidental effects of enforcement policies directed at third parties to create Article III standing for themselves.

The Supreme Court's decision in *Alliance* confirms that the Organizations lack standing here. Although the Organizations allege that they have been frustrated in accomplishing certain aspects of their missions, they continue to have ample opportunity to serve their constituent communities in other ways. And any claimed need to divert resources to address any frustration of mission is insufficient for standing under the Supreme Court's holding in *Alliance*. *See, e.g.*, *Coal. on Homelessness v. City & Cnty. of San Francisco*, 758 F. Supp. 3d 1102, 1128 (N.D. Cal. 2024) ("[T]he Supreme Court recently rejected the 'frustration-of-mission and diversion-of-resources theories' in [*Alliance*].").

In *Alliance*, the Supreme Court rejected the view that an organization's diversion of resources in response to a policy which touches on, or frustrates its mission, provides a basis for standing to challenge that policy. *See* 602 U.S. at 395. Instead, an unregulated organization must show that the challenged action "perceptibly impair[s]" or "interferes with" its activities by imposing an affirmative "impediment" to performing those activities. *Id.* This requirement safeguards against an organization being permitted to "spend its way into standing." *Id.*

The Organizations do not plead the type of interference with, or impairment of, their existing legal services that could amount to a cognizable injury under *Havens Realty*. Nothing about the Proclamation, alleged Asylum Shutdown Policy, or

Executive Order directly regulates the Organizations' provision of legal, humanitarian, or social services. Here, the Organizations allege that their core business activities are impeded because aliens are no longer presenting at the U.S.–Mexico border POEs to initiate the asylum process in the same numbers as in the past due to the Proclamation. Compl. ¶¶ 152, 155. That, at most, amounts to an abstract injury to the Organizations' mission of assisting aliens to present asylum claims or provide related immigration legal services. It is not a direct impairment of their provision of guidance or legal assistance to asylum-seekers still in Mexico or to whom asylum relief is available. An injury to the Organizations' interests is not the same thing as an impairment of their ability to serve asylum-seekers.

Finally, the Organizations do not allege the likelihood of an imminent funding loss due to the Proclamation. *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (holding the Organizations must show "a substantial probability of injury" to obtain universal relief); *Lujan*, 504 U.S. at 560, 571 n.4 (injury must be "actual or imminent" at the time of filing suit). Without specific information about any alleged funding impacts, Plaintiffs cannot meet their burden to show a probable funding loss that is traceable to those aspects of the Proclamation they challenge. *See Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (finding lack of standing where organization did not provide specifics to support theory of injury). AOL's allegations that the decrease in asylum seekers presenting at POEs has "threatened" funding streams and contracts for work (Compl. ¶¶ 35, 152) does not meet the test.

As the Supreme Court explained in *Alliance*, an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394. Although the Supreme Court references advocacy activities, the principle announced in *Alliance* is broader—it places the focus of the injury analysis on the impairment of the organization's services, rather than on the organization's expenditures or allocation of resources. This principle is thus not limited to "issue-advocacy" organizations, but applies

equally to direct services organizations who spend money or resources in response to the challenged policy without any corresponding impairment to their ability to provide services.[2] As the Supreme Court's reasoning in *Alliance* made clear, courts should not allow an organization to demonstrate standing any time it shifts resources from one set of direct-service activities to another set of similar activities in support of its mission. Instead, the organization must show that the new policy directly harms its already-existing core activities. To hold otherwise would allow organizations to manufacture standing to challenge any policy that touches on their mission by voluntarily spending money in response to the policy and in support of their mission. *See Alliance*, 602 U.S. at 394. The Organizations thus lack Article III standing.[3]

           2.     *The Organizations are not within the relevant zone of interests.*

      Even if Plaintiffs' resource-diversion claim of injury satisfied Article III's requirements, their APA claims would nevertheless fail because the effect on their

---

[2] In its recent decision on a stay motion in *Immigrant Defenders Law Center v. Noem*, 145 F. 4th 972 (9th Cir. 2025), the Ninth Circuit glossed over this requirement, finding a "concrete and demonstrable injury" to core activities without adequately explaining what precisely constituted the impairment to those activities that triggered the identified re-allocation or expenditure of resources—seemingly equating those uses of resources with the impairment itself. *Id.* at 987–89. That reasoning runs contrary to the holding of *Alliance*. But this decision is in any event not instructive here, where Plaintiffs do not base their arguments on the type of expenditures alleged in *Immigrant Defenders*, and given that the Ninth Circuit is currently considering en banc an appeal that addresses the impact of *Alliance* on the Circuit's organizational-standing precedents, *see Ariz. All. for Retired Ams. v. Mayes*, 130 F.4th 1177 (9th Cir. 2025) (ordering rehearing en banc).

[3] Additionally, four of the Individual Plaintiffs have not alleged facts demonstrating an injury, because they do not allege they had a CBP One appointment that was cancelled, or that they attempted to present themselves at a POE on the U.S.–Mexico border. *See* Diana Doe, Compl. ¶¶ 137–38 (lacked CBP One appointment and does not allege an attempt to approach a POE to initiate the asylum process); Nikolai Zolotov, Compl. ¶ 140 (same); Anahi Doe, Compl. ¶ 144 (same); and Dragon Doe, Compl. ¶ 147 (no CBP One appointment and alleges a Mexican police officer told him the United States was not letting anyone cross the border). Based on their own allegations, these Individual Plaintiffs lack standing.

own expenditures does not fall within the zone of interests of 8 U.S.C. § 1158, the statute that Plaintiffs seek to enforce. A plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to sue under the APA. 5 U.S.C. § 702. To satisfy that requirement, "the plaintiff must establish that the injury" it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue. *Air Courier Conference of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523 (1991) (quotation omitted).

Where, as here, the Organizations are not the object of a challenged regulatory action, they have no right of review if their "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Nothing in the INA generally, or § 1158 specifically, suggests that Congress intended to permit organizations to enforce alleged asylum rights of others based on attenuated effects on the organization's allocations of resources. Section 1158 focuses on the interests of asylum seekers without evincing any desire to protect the interests of organizations that assist asylum seekers. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.").[4] Further, Congress's decision to construct a "complex scheme" for judicial review of individual claims raised in removal proceedings while omitting any provision for participation by entities like Plaintiffs "is sufficient reason to believe that Congress intended to foreclose" them from obtaining judicial review of immigration decisions under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984).

---

[4] Although AOL was found to be within the zone of interests of the INA in *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1301 (S.D. Cal. 2018), that ruling is not persuasive because it also was issued before the Supreme Court made clear in *Texas* that third parties like the Organizations have no cognizable interest in the way the Executive conducts immigration enforcement.

**B.      Plaintiffs' challenge to the Proclamation is not justiciable.**

Plaintiffs' First, Second, Third and Sixth Claims—which claim a deprivation of access to the U.S. asylum process—all fundamentally challenge the Proclamation and its implementation. Ultimately, it is Section 3 of the Proclamation that suspends the entry of the Individual Plaintiffs and others like them. Yet these challenges are nonjusticiable for several reasons.

**1.      The Court lacks jurisdiction to hear challenges to the President's authority under 8 U.S.C. § 1182(f).**

The Court has no jurisdiction to hear challenges to the President's authority under 8 U.S.C. § 1182(f) on behalf of the Individual Plaintiffs, all of whom are aliens located outside the United States. The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). "The conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo*, 430 U.S. at 796 (citation omitted).

The Supreme Court has conducted extremely limited review of denials of entry only in circumstances where a U.S. citizen claims that a visa denial burdens the U.S. citizen's own constitutional rights. *See Kleindienst v. Mandel*, 408 U.S. 753 (1972). But the Individual Plaintiffs are not within the United States, let alone U.S. citizens, and have not identified any Constitutional right that is burdened by the Proclamation's conditions on entry of certain aliens during emergency border circumstances. While Congress arguably "may, if it sees fit, ... authorize the courts to" review decisions to exclude noncitizens, *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (citation omitted), Congress has never authorized review of a suspension or limitation

on entry under § 1182(f). *Cf. Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (noting it is "not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien" (citation omitted)); *see also Hawaii*, 585 U.S. at 712 (Thomas, J., concurring) (noting Congress's ability to set "any judicially enforceable limits that constrain the President" is limited because "the president has inherent authority to exclude aliens from the country").

This longstanding principle is embodied in the INA, at 8 U.S.C. § 1252, where Congress established a statutory framework for judicial review of decisions concerning aliens' ability to enter or remain in the United States. But that review is available only to aliens who are already physically present in the United States. *See generally* 8 U.S.C. § 1252. Neither § 1252 nor any other provision of the INA provides for review of a denial of entry to an alien who is outside the United States. It is thus a fundamental separation-of-powers principle, long recognized by courts, that outside of certain very limited constitutional claims brought by United States citizens, the Executive's decision to exclude aliens is not judicially reviewable.

### 2.    *Plaintiffs cannot seek equitable relief against the President.*

Plaintiffs cannot seek relief against the President under equitable principles (as in their First and Sixth claims), because courts lack jurisdiction to issue injunctive relief against "the President in the performance of his official duties." *Mary Ferrell Found., Inc. v. Biden*, No. 22-cv-06176-RS, 2023 WL 4551066, at *3 (N.D. Cal. July 14, 2023); *see also Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (vacating injunctive relief against President Trump), *vacated as moot*, 138 S. Ct. 377 (2017). Courts likewise cannot issue declaratory relief with respect to Presidential actions. *Newdow*, 603 F.3d at 1012–13; *see also Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 291 (D. Mont. 2019) ("Separation-of-power[s] principles generally counsel against courts granting injunctive and declaratory relief against the President in the performance of his official duties." (citing *Franklin v. Massachusetts*,

505 U.S. 788, 802–03 (1992) (plurality))). The request for relief against the President in those claims, as well as in the Prayer for Relief, should be dismissed or, in the alternative, stricken. Moreover, because the legal consequences of each challenged action flow from the Proclamation itself, which cannot be enjoined, and because agency officials are bound by the Proclamation's directive regardless of whether their agency guidance is vacated or enjoined, there is no possible relief this Court could grant to redress the Plaintiffs' claimed injuries. *See Texas*, 599 U.S. at 691 (Gorsuch, J., concurring) (vacating or enjoining agency guidance will not redress a plaintiff's injury if agency retains the same authority even in the absence of the guidance); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

### 3. *Plaintiffs cannot challenge the Proclamation under the APA.*

As the Complaint implicitly acknowledges by bringing only non-APA claims against the President, the President is not an agency, and his actions are not subject to APA review. *See Franklin*, 505 U.S. at 801 (holding that the President's "actions are not subject to [the APA's] requirements" and are thus not reviewable under the APA); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018) ("The scope of our review [under the APA] … is limited to 'agency action,' and the President is not an 'agency.'"). Thus, Plaintiffs cannot challenge the Proclamation under the APA.

Nor can Plaintiffs pursue an APA claim against the agency defendants. *First*, the action with operative legal effect on Plaintiffs is the Proclamation. Plaintiffs do not, and cannot, identify a final agency action distinct from the President's Proclamation. *See* 5 U.S.C. § 704. APA challenges can succeed only where the plaintiff "identif[ies] a discrete 'agency action' that fits within the APA's definition of that term." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013). The Supreme Court has held that Courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability … designed to implement' that decision." *Biden v. Texas*, 597 U.S. 785, 809 (2022) (quoting 5 U.S.C. § 551(4)). Therefore, APA review is not available if the

Plaintiffs have not identified a particular operative agency action with legal effect. *Id.* at 809. Similarly, here, the Proclamation—and its directive to the Secretary, the Attorney General, and the Department of State to act to enforce its suspension on entry—is the only legally relevant document. Any guidance or actions taken to implement that legally operative Proclamation is not an independent, final agency action. *See, e.g.*, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (holding that agency guidance that "restated" legal requirements contained in other sources and thus was "purely informational in nature" was not a reviewable agency action); *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (recognizing that "interpretative rules or statements of policy generally do not qualify" as final agency action and are not subject to judicial review under the APA "because they are not finally determinative of … issues or rights").

*Second*, the APA expressly leaves intact "other limitations on judicial review," 5 U.S.C. § 702(1), which include the longstanding restriction on review of Executive decisions to deny entry to aliens. *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018). The APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). A Proclamation under 8 U.S.C. § 1182(f) and § 1185(a)(1) is such a discretionary action because these statutory provisions provide the President with broad discretionary authority to suspend by proclamation the entry of any class of aliens whenever he finds their entry would be detrimental to the United States. *See infra* Section III.C; *Hawaii*, 585 U.S. at 684 ("By its terms, § 1182(f) exudes deference to the President.").

Plaintiffs cannot evade these limitations on review simply by labeling any suspension of entry at POEs an "Asylum Shutdown Policy." The alleged "Asylum Shutdown Policy" is not a discrete agency action separate from actions taken to implement the Proclamation. *See* Compl. ¶ 13 (alleging "Asylum Shutdown Policy" constitutes "decision[] … to effectively close southern border POEs to people seeking

asylum"). Plaintiffs' Complaint fails to identify an actual policy document, regulation, or official agency decision like "a memorandum that formally articulate[s] the agency's position," other than the Proclamation. *Wild Fish Conservancy*, 730 F.3d at 801; *see also infra* Section III.D.2.

### C.    There is no right to asylum for aliens outside the United States, particularly where entry is suspended.

Plaintiffs' First, Second, and Sixth Claims for Relief are premised on the notion that there is a "statutory obligation to provide access to the U.S. asylum process" to aliens who are not present in the United States. Compl. ¶ 13; *see also id.* ¶¶ 170–71, 180–81, 209. But § 1158(a)(1) does not support the premise that aliens in Mexico have rights to cross the border line into the United States to seek asylum when the President has suspended entry. In this regard, the Supreme Court's pronouncement and holding in *Sale* directly controls, where the Court stated that the President could employ his authority under § 1182(f) via naval blockade to prevent aliens from entering the United States to seek asylum. As there is no right to asylum processing for Plaintiffs or others outside the United States, these claims must be dismissed.

Under the INA, "[a]ny alien who is physically present *in* the United States or who arrives *in* the United States (whether or not at a designated port of arrival[)] … may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphases added). Contrary to Plaintiffs' arguments (Compl. ¶ 47), the phrase "arrives in" requires an alien to be *in* the United States to apply for asylum. Defendants recognize that the Ninth Circuit has interpreted this phrase in § 1158(a)(1) to apply to certain aliens who are still in Mexico. *See Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1118 (9th Cir. 2025) (concluding that an alien stopped by U.S. officials at the border is eligible to apply for asylum).[5] But that decision did not involve a Presidential

---

[5] On July 1, 2025, Defendants filed a petition for writ of certiorari regarding this ruling. *See Noem v. Al Otro Lado*, No. 25-5. The response to that petition is due October 8, 2025. *See id.* Moreover, the Ninth Circuit ruling is much narrower than the relief sought here. It interpreted the territorial scope of "arrives in" to encompass those

proclamation issued pursuant to § 1182(f) and therefore does not control the outcome here.

Regardless of the scope of the asylum statute, the Proclamation permits the President to deny entry to Plaintiffs and members of the proposed classes. The Proclamation contemplates that DHS shall prevent the entry of aliens who fail to provide the requisite background information. As discussed, the authorities relied on in the Proclamation, 8 U.S.C. §§ 1182(f) and 1185(a), accord enormous discretion to the President to suspend entry and impose restrictions on aliens. This discretion and authority necessarily permit the President to deny physical entry to aliens, regardless of whether they intend to seek asylum. Indeed, the D.C. Circuit recently held that the same Proclamation lawfully authorizes asylum to be denied even for people already in the United States. *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-5243 (D.C. Cir. Aug. 1, 2025) (granting partial stay, with Judges Millett and Katsas concurring and agreeing that the Proclamation could preclude asylum for people in the United States).

The Supreme Court has upheld the use of § 1182(f) to prevent the physical entry of migrants into United States territory through the interdiction of migrants at sea before they reached the border, concluding that the INA's protections against withholding of removal did not limit that authority. *Sale*, 509 U.S. at 187–88. As the Supreme Court stated, "[i]t is perfectly clear that 8 U.S.C. § 1182(f) … grants the President ample power to establish a naval blockade that would simply deny illegal Haitian immigrants the ability to disembark on our shores." *Sale*, 509 U.S. at 187; *see also Hawaii*, 585 U.S. at 685. Similarly here, it is "perfectly clear" that § 1182(f) grants the President power to prevent migrants who are not yet present in the United States from crossing the border into the United States and to define the conditions

---

aliens who are stopped by CBP Officers at the border, *see id. at* 1113—not all aliens who are or will at some point in the future be in Mexico and who would like to seek asylum in the United States. That ruling cannot be read to give a freestanding right to seek asylum in the United States to any aliens whatsoever.

under which they may enter, regardless of the asylum statute. The Proclamation's restriction on entry falls squarely within the authority in § 1182(f) because it "concern[s] the *suspension* of entry." *E. Bay Sanctuary Covenant*, 932 F.3d at 773 (emphasis in original).

Based on their plain text, §§ 1182(f) and 1185(a) provide no basis for judicial second-guessing of the President's determinations about what restrictions to "prescribe" or what restrictions are necessary to avoid "detriment[] to the interests of the United States." Congress specifically entrusted those matters to the President, and "the power to expel or *exclude* aliens as a fundamental sovereign attribute exercised" by the political branches remains "largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (1977) (emphasis added). In fact, "[t]he right to do so stems not alone from legislative power but is *inherent* in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added); *see Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (holding that the "historical gloss on the executive Power vested in Article II of the Constitution has recognized the President's vast share of responsibility for the conduct of our foreign relations" (cleaned up)).

Here, the restrictions introduced by the President under §§ 1182(f) and 1185(a) are inextricably linked to his "broad power over the creation and administration of the immigration system," which necessarily includes the regulation of such discretionary benefits as asylum. *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring). Thus, in addition to the clear statutory basis on which the Proclamation rests, the President's decision to impose restrictions in the national interest is a fundamental act of sovereignty and consistent with his Executive duty to maintain effective control over the immigration system as a whole. *Knauff*, 338 U.S. at 542–43.

Thus, the First, Second, Third, and Sixth Claims for Relief must be dismissed.

//

//

**D. Plaintiffs fail to state viable claims for relief.**

       *1. Plaintiffs' First Claim for violation of the INA is defective.*

In their first claim, Plaintiffs bring a non-statutory challenge regarding the Proclamation and the alleged "Asylum Shutdown Policy," seeking to have them declared unlawful and enjoined. Compl. ¶ 174. But, as discussed above, because equitable relief is not available against the President, *see supra* Section III.B.2, the claim should be dismissed as to him. It should also be dismissed as to the remaining Defendants, because a non-statutory claim cannot displace an APA claim, even if the APA claim is not viable. "[T]he APA is the general mechanism by which to challenge final agency action." *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019). "While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless *specifically* excluded." *Webster v. Doe*, 486 U.S. 592, 607 n.* (1988) (Scalia, J., dissenting); *see Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (citing Justice Scalia's *Webster* dissent with approval). "[I]f review is not available under the APA it is not available at all." *Webster*, 486 U.S. at 607 n.* (Scalia, J., dissenting); *Graham v. FEMA*, 149 F.3d 997, 1001 n.2 (9th Cir. 1998) (same), *recognized as abrogated on other grounds in Novak v. United States*, 795 F.3d 1012, 1019 (9th Cir. 2015).

       *2. Plaintiffs' Second Claim for violation of the APA is defective.*

Plaintiffs' Second Claim for Relief brought under § 706(2) of the APA challenges the alleged "Asylum Shutdown Policy" as contrary to law. Compl. ¶¶ 181–182. But Plaintiffs do not plausibly allege a discrete agency action distinct from the Proclamation. And, as already discussed, the Proclamation is within presidential authority. *See supra* Section III.B.1.

Failure to allege a discrete agency action is fatal to Plaintiffs' claim because the APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a

relevant statute." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004) (quoting 5 U.S.C. § 702). Here, Plaintiffs challenge a vague "Asylum Shutdown Policy" that is broadly defined as Defendants' actions taken to "effectively close the southern border POEs to people seeking asylum." *Id.* ¶ 13. This involves actions taken by Defendants, and in some instances, with the alleged coordination of Mexican officials, but Plaintiffs fail to identify a particular, discrete agency policy that is the subject of their challenge. *See* Compl. ¶ 183. They have thus failed to allege a "'discrete' action[] by an agency" amenable to APA review. *Bark v. U.S. Forest Service*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (quoting *Norton*, 542 U.S. at 63).

Further, actions taken by Mexican officials or other non-government actors are not agency actions that can be evaluated under the APA. *See* 5 U.S.C. §§ 702, 704 (providing for judicial review of "agency action"); *W. State Univ. of S. Cal. v. Am. Bar Ass'n*, 301 F. Supp. 2d 1129, 1133 (C.D. Cal. 2004) ("By its own language, the APA does not extend to an entity that is not a federal agency … ."). And the Complaint does not allege any discrete, reviewable action CBP has taken with respect to its alleged coordination with Mexican officials across the border. For these reasons, the allegations do not demonstrate a discrete agency action that this Court can review under the APA.[6]

### 3.    Plaintiffs' Third Claim for violation of the APA is defective.

Plaintiffs' Third Claim for Relief challenges the alleged "Asylum Shutdown Policy" as arbitrary and capricious. But, as discussed, Plaintiffs do not challenge a discrete agency action; and they also do not allege the existence of an "Asylum Shutdown Policy" distinct from the Proclamation which, as already discussed, is not subject to challenge and is lawful. Further, even assuming Plaintiffs could raise a challenge to the vague "Asylum Shutdown Policy" based on their lack of access to

---

[6] To the extent that Plaintiffs' claims for relief seek to prohibit Defendants from "coordinating" with Mexican government officials, it is predicated on a political question: whether and to what extent it is lawful for the United States to allegedly coordinate with Mexico regarding travel across the countries' shared border.

POEs, this claim impermissibly seeks to have the Court review CBP's management of intake and processing of inadmissible aliens. This implicates the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," and is therefore "committed to agency discretion by law" and unreviewable under the APA. 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *infra* Section III.D.5.

> 4.    *Plaintiffs' Fourth Claim fails because the cancellation of CBP One appointments does not require notice-and-comment.*

The cancellation of CBP One appointments is, at most, a rule of agency procedure that falls into the procedural and foreign affairs exceptions to the APA's notice-and-comment requirement. Accordingly, Plaintiffs' Fourth Claim for Relief must be dismissed.

"Under the APA, a federal administrative agency is required to follow prescribed notice-and-comment procedures before promulgating substantive rules." *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010) (quoting *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009)). But notice and comment is not required prior to issuance of "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b)(A). It is also not required where the action involves "a foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). In determining whether a directive qualifies for one of § 553's exemptions, the Ninth Circuit has "focused upon the effect of the regulation or directive upon *agency decisionmaking*, not the public at large." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1016 (9th Cir. 1987) (footnote omitted) (emphasis in original); *see also S. Cal. Edison Co. v. FERC*, 770 F.2d 779, 783 (9th Cir. 1985) (discussing "rules of agency organization, procedure, or practice"). The Ninth Circuit "ha[s] 'rejected the notion that procedural rules with a substantive impact are subject to the notice and comment requirements.'" *Sequoia Orange Co. v. Yeutter*, 973 F.3d 752, 757 (9th Cir. 1992) (quoting *S. Cal. Edison*, 770 F.2d at 783); *see also Erringer*

*v. Thompson*, 371 F.3d 625, 633 n.15 (9th Cir. 2004) ("Even if there may be some substantive impact, procedural rules apply to 'technical regulation of the form of agency action and proceedings.'" (quoting *S. Cal. Edison*, 770 F.2d at 783)). The Ninth Circuit looks to the D.C. Circuit on the subject of APA compliance and analysis of § 553 exceptions. *In re A Cmty. Voice*, 878 F.3d 779, 781–82 (9th Cir. 2017) ("In determining [APA issues], we look to the relevant statutory provisions, the controlling law of this circuit, and the more developed law of the District of Columbia Circuit.").

The D.C. Circuit has stated that "the critical feature of a rule that satisfied the so-called 'procedural exception' is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000). An action that does not change "substantive standards" falls within that exception. *Id.* In *Hurson Assocs.*, the D.C. Circuit found that a rule that eliminated routine face-to-face review of labels by the USDA's Food Safety Inspection Service was a procedural rule. *Id.* at 279, 281.

Here, as in *Hurson Assocs.*, the cancellation of existing CBP One appointments changes the methods for presenting oneself at a port of entry, but does not alter the substantive standards governing admission to the United States at a port of entry, or any rights to seek asylum. It "simply change[s] the procedures [CBP] would follow" to manage the entry of inadmissible aliens at ports of entry. *See id.* at 281; *see also Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 246, 250 (D.C. Cir. 2014) (determining that a process that allowed the EPA to screen and discuss permit applications submitted to the Army Corps of Engineers was a procedural rule). For this reason, the agencies did not conduct notice and comment before the creation of CBP One's appointment-scheduling functionality, and it was not required. The cancellation of existing CBP One appointments—as well as the elimination of the CBP One appointment functionality—does not change any substantive right to seek asylum or any alleged substantive right to seek parole, or even any alleged right that Plaintiffs

may claim to cross the border into the United States at a POE (which Defendants dispute) to be inspected. Moreover, the CBP One Plaintiffs' inability to access a POE is due to the Proclamation's suspension on entry, not to the cancellation of their appointments. The holding of an appointment created no substantive rights to entry, and Plaintiffs do not so allege. Each Plaintiff with an appointment would still not be permitted to enter under the Proclamation even if their appointments had not been cancelled.

In other words, reliance on an appointment as a means of entering the United States for inspection is not sufficient to transform a procedural decision into a substantive one. But even assuming the cancellation of appointments were not a procedural decision, the foreign affairs exception would also apply because the decision involves aliens who are currently or were previously in Mexico and thus implicates the United States' relationship with Mexico and other nations in the region. *See* 5 U.S.C. § 553(a)(1); *Am. Ass'n of Exporters v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (the exception applies to actions "linked intimately with the Government's overall political agenda concerning relations with another country").

### 5. *Plaintiffs' Fifth Claim is defective because the cancellation of CBP One appointments is unreviewable under the APA.*

Plaintiffs' Fifth Claim for Relief likewise fails because the cancellation of CBP One appointments is not a "final" agency action capable of review under the APA and because management of intake at POEs is committed to agency discretion by law.

Agency action is final when it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). "The general rule" under the second *Bennett* prong is that agency action must "impose an obligation, deny a right, or fix some legal relationship" to be final. *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990). Here, as explained, the cancellation of an appointment is not in itself the denial of any right.

The cancellation does not alter the substantive rights of the Plaintiffs and thus cannot qualify as agency action "from which *legal* consequences will flow." *Bennett*, 520 U.S. at 178 (emphasis added); *see also Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 418 (9th Cir. 2023) (agency action that did not impose any obligation or confer any right was not final agency action).

Moreover, the APA precludes review of actions that "are committed to agency discretion by law," 5 U.S.C. § 701(a)(2), such as the management of intake at POEs. Congress has charged DHS and CBP with managing POEs in a safe and orderly manner that balances competing priorities including combatting terrorism, managing and securing the safety of the borders, and ensuring orderly and efficient flow of lawful traffic and commerce. *See* 6 U.S.C. §§ 111(b)(1), 202, 211(c), (g)(3); 8 U.S.C. § 1103(a)(1), (3), (5). Managing the intake and processing of undocumented aliens— whether with or without appointments—allows CBP to balance its multiple missions and "manage the flows [of migrants] in a safe and efficient manner." 88 Fed. Reg. at 31,318. Such mission-balancing and resource-management is a core matter for executive discretion and implicates the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Heckler*, 470 U.S. at 831. This is especially important in the context of border management, as it implicates the "dynamic nature of relations with other countries," *Arizona v. United States*, 567 U.S. 387, 397 (2012), like Mexico and other regional partners. Thus, to the extent the decision to cancel CBP One appointments can be separately challenged at all, it is a decision that is "committed to agency discretion by law" and unreviewable under the APA. 5 U.S.C. § 701(a)(2); *Heckler*, 470 U.S. at 831.

> 6.    *Plaintiffs' Sixth Claim fails because the Proclamation is within the President's statutory authority.*

Even assuming that an ultra vires action outside of the APA's framework may sometimes be cognizable, Plaintiffs' ultra vires claim is not. While courts have recognized an equitable cause of action to enjoin ultra vires official conduct in certain

circumstances, this is a "doctrine[] of last resort" that is "intended to be of extremely limited scope." *Terveer v. Billington*, 34 F. Supp. 3d 100, 123 (D.D.C. 2014) (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Plaintiffs have not pleaded sufficient facts to meet this high standard. The "modern cases make clear" that an officer may be said to act ultra vires "only when he acts 'without any authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 n.11 (1984) (citation omitted); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (holding suit must allege that official is "not doing the business which the sovereign has empowered him to do," not just that the official acted illegally). Here, the "business" of the "sovereign" encompasses issuing the Proclamation, *see* 8 U.S.C. § 1182(f); *see also Kerry*, 576 U.S. at 106 (Kennedy, J., concurring) (describing the executive's "broad power over the creation and administration of the immigration system"). Therefore, this is not the rare case in which a nonstatutory cause of action is available to enjoin ultra vires conduct.

## IV. Conclusion

For the foregoing reasons, the United States respectfully requests that the Court grant its motion to dismiss.

DATED: September 11, 2025

Respectfully submitted,

ADAM GORDON
United States Attorney

*s/ Ernest Cordero, Jr.*
ERNEST CORDERO, JR.
KELLY A. REIS
Attorneys for Defendants